# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 11-334 c/w 11-335


**ALAN KITE**

**VERSUS**

**KITE BROS., ET AL.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, DOCKETS NO. C-2006-0241 c/w C-2007-1110
HONORABLE F. RAE SWENT, PRESIDING
\*\*\*\*\*\*\*\*\*\*


**SYLVIA R. COOKS**
**JUDGE**


\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Oswald A. Decuir, and Jimmie C. Peters, Judges.


**AFFIRMED**.

**Kenneth Michael Wright**
**Kenneth Michael Wright, LLC**
**203 W. Clarence Street**
**Lake Charles, LA 70601**
**(337) 439-6930**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
      **Alan Kite**

**Scott J. Scofield**
**Phillip W. DeVilbiss**
**Scofield, Gerard, Singletary & Pohorelsky**
**901 Lakeshore Drive, Suite 900**
**P.O. Drawer 3028**
**Lake Charles, LA 70601**
**(337) 433-9436**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
      **Robert J. Kite and Kite Bros., L.L.C.**

**COOKS, Judge.**

In 1961, Robert Kite (Mr. Kite) co-founded a recreational vehicle dealership with his brother. The company was originally formed as a corporation, Kite Bros., Inc. On April 30, 1998, Kite Bros., Inc. became inactive when Mr. Kite formed a limited liability corporation, Kite Bros., L.L.C. Since its formation, Mr. Kite has been the sole member, manager and owner of Kite Bros., L.L.C.

At different points in the 1980s, Mr. Kite's two sons, Alan Kite and Jeff Kite, began working for the corporation. When Kite Bros., L.L.C. was formed, both brothers were employed there, although the record indicated Alan never had employment contracts with either Kite Bros., Inc. or Kite Bros., L.L.C. Over time, Alan was given the authority to write checks on the company account, including payroll checks. However, it was testified that neither Alan nor Jeff had authority to change their salary or commission rate.

Mr. Kite testified he was always very generous to Alan, and paid him substantially more than other salesmen with the company, receiving a salary of $1,500.00 per week. Alan also received a commission based on a written schedule which Mr. Kite created. Alan was provided with a company truck and a company credit card. Testimony revealed Alan consistently made in excess of $200,000.00 in annual compensation.

In September of 2005, Alan and Jeff, on their own, raised their salaries. The raises Alan took were significant, at times more than triple his previous weekly salary. Alan and his brother also agreed they would take another ten percent (10%) of all revenues of Kite Bros., L.L.C. Alan testified he and his brother would continue to take the increased salaries and the cut of revenues "until everything settled down after the storm [Hurricane Rita]."

It was undisputed that neither Alan nor Jeff cleared their raises nor the decision to take ten percent (10%) of the revenues with Mr. Kite. In January of

2006, Mr. Kite discovered Jeff's salary had been raised without his permission. Mr. Kite told Jeff to return his salary to the authorized level. Mr. Kite then proceeded to revoke Alan and Jeff's authority to write checks and cancelled their credit cards. Despite this, Alan submitted a pay sheet the following week documenting a salary due of $5,000.00, rather than the agreed upon $1,500.00 per week.

On January 19, 2006, both Alan and Jeff left the employ of Kite Bros., L.L.C. It was disputed as to whether the brothers left on their own accord or were fired. Not in dispute is that when Alan left the premises, he took with him business papers belonging to Kite Bros. L.L.C. without permission. Among the papers removed were records which documented the deferred commissions due to Alan.

Mr. Kite filed a criminal complaint over the papers removed by Alan. When the investigating officer contacted Alan, he was assured by Alan that the papers would be returned the next day. However, Alan did not return the papers and kept them in his possession until August of 2006, when his attorney returned some of the papers to Mr. Kite's attorney. Alan has continued to remain in possession of some of the business papers to this date.

According to Mr. Kite, when Alan left he wanted to make sure Alan received everything he was entitled to in terms of compensation. However, reaching an exact figure owed was difficult due to the lack of documentation because of Alan's removal of certain business records. Mr. Kite testified, to be safe, he simply wrote Alan a check for $100,000.00, minus employment taxes. He believed this more than adequately covered any compensation Alan was due. Alan acknowledged receiving this check in February of 2006.

In March of 2006, Alan and Jeff filed a lawsuit against their father and Kite Bros., L.L.C. Several claims were alleged, including: (1) retaliatory discharge; (2) detrimental reliance; (3) defamation; (4) failure to pay final wages; (5) failure to

2

deliver insurance policies; (6) failure to deliver retirement accounts; and (7) a claim for an injunction ordering the return of a bass boat. Mr. Kite and Kite Bros., L.L.C. brought reconventional demands against the brothers for taking unauthorized salaries and raises.

Mr. Kite, stating he was saddened by the family squabbling, agreed during a mediation to settle Alan and Jeff's claims. The settlement agreement required that Mr, Kite be treated with respect and he be granted access to his grandchildren. Asserting that Alan did not uphold the agreement, Mr. Kite filed a lawsuit seeking to declare the mediated agreement null. That lawsuit was consolidated with the suit stemming from Alan and Jeff's claims. The mediated agreement was rescinded.

During that time period, Alan and Jeff began a competing RV dealership, Kite RV, L.L.C. Shortly after its inception, Alan and Jeff began arguing over control of the company. As a result, Jeff reconciled with his father and dismissed his claims against him.

On January 21, 2010, Mr. Kite moved for summary judgment dismissing Alan's claims. The motion for summary judgment was supported with numerous affidavits and depositions supporting the granting of summary judgment.

In his argument to defeat the motion for summary judgment, Alan argued simply that there were several genuine issues of material fact that precluded summary judgment. The trial court ordered Alan to "identify in writing the specific statements" that created the genuine issues of material fact. However, Alan did not provide the court with any such written documentation.

On July 16, 2010, the trial court issued written reasons granting partial summary judgment, dismissing several, but not all, of Alan's claims. The trial court granted summary judgment on the defamation claim, finding "the fact that Alan did do what any reasonable person would see was stealing would be a

3

complete defense to the action for defamation." The trial court also granted summary judgment on Alan's ownership claim based on the doctrine of detrimental reliance, finding "Alan has acknowledged elsewhere that [Mr. Kite] was the sole owner of [Kite Bros.,] LLC and Alan disclaimed any ownership of the [Kite Bros.,] LLC in his divorce proceedings. The trial court also granted summary judgment dismissing Alan's retaliatory discharge claim. It was acknowledged by both parties at the hearing that the claim regarding failure to deliver retirement accounts, as well as the claim for an injunction ordering the return of a bass boat, were moot. The judgment did not dismiss Alan's two other claims alleging the failure to pay final wages and deliver insurance policies.

At Alan's request, the trial court stated that these partial summary judgments were final pursuant to La.Code Civ.P. art. 1915(B)(1). Alan then filed the present appeal, asserting the trial courts grants of partial motion for summary judgment were in error.

## ANALYSIS

### *Designation of Judgment as Final.*

As the three of Alan's claims that were dismissed was done so in a partial motion for summary judgment, we first consider whether the judgment is properly before the court. An appellate court cannot determine the merits of an appeal unless its jurisdiction is properly invoked by a valid final judgment. La.Code Civ.P. art. 2083. In this case, at Alan's request, the trial court designated its partial summary judgment as final pursuant to La.Code Civ.P. art. 1915(B)(1). No reasons for this determination were given, other than the trial court stating in the judgment that "there is no just reason for delay."

This court in *Fakier v. State of La., Bd. of Sup'rs for University of La. System*, 08-111 (La.App. 3 Cir. 5/28/08), 983 So.2d 1024, 1027, set forth the

4

procedure to be followed in reviewing an Article 1915(B) judgment designated without reasons:

> The proper standard of review for an order designating a judgment as final and immediately appealable, when the order is accompanied by explicit reasons for the certification, is whether the trial court abused its discretion. However, if the trial court fails to give explicit reasons for the certification, the appellate court should conduct a *de novo* determination of whether the certification was proper. *R.J. Messinger, Inc. v. Rosenblum*, 04-1664 (La.3/2/05), 894 So.2d 1113. Accordingly, we will conduct a *de novo* review. Likewise, because the peremptory exception of no cause of action raises a question of law and the district court's decision is based solely on the sufficiency of the petition, review of the district court's ruling on a peremptory exception of no cause of action is *de novo*. *Scheffler v. Adams and Reese, LLP*, 06-1774 (La.2/22/07), 950 So.2d 641.

The *Fakier* court, citing the supreme court's opinion in *R.J. Messinger, Inc. v. Rosenblum*, 04-1664 (La.3/2/05), 894 So.2d 1113, listed several non-exclusive factors for use by trial courts when determining certification of a judgment and for use by appellate courts when conducting *de novo* reviews when no reasons are given by the trial court for designation. The factors for examining certification are:

> 1) The relationship between the adjudicated and unadjudicated claims;
>
> 2) The possibility that the need for review might or might not be mooted by future developments in the trial court;
>
> 3) The possibility that the reviewing court might be obliged to consider the same issue a second time; and
>
> 4) Miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Fakier*, 983 So.2d at 1029 (quoting *Messinger*, 894 So.2d at 1122).

Our analysis of the case at bar under the *Fakier* factors favors designation of the judgment as final. There is little relation between the unadjudicated and adjudicated claims, and there is little possibility the issues considered in this appeal would be revisited in future proceedings.

Therefore, we find no error in the trial court's decision to designate the judgment as final.

*Standard of Review.*

Louisiana Code of Civil Procedure Article 966(B) states that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." In *Boykin v. PPG Industries, Inc.*, 08-117, p. 4 (La.App. 3 Cir. 6/18/08), 987 So.2d 838, 842, *writs denied*, 08-1634 and 08-1649 (La.10/31/08) 994 So.2d 537, this court explained the standard of review applicable to motions for summary judgment, stating:

> Appellate courts review a trial court's grant or denial of a motion for summary judgment using the de novo standard of review, under the same criteria that govern the trial court's consideration of whether a summary judgment is appropriate in any given case. *Indep. Fire Ins. Co. v. Sunbeam Corp.*, 99-2181, 99-2257 (La.2/29/00), 755 So.2d 226.

*Defamation Claim.*

Alan based his defamation claim on the basis that Mr. Kite referred to Alan as a "thief" and a "liar." Four elements are necessary to establish a defamation cause of action: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. *Costello v. Hardy*, 03-1146, pp. 12-14 (La.1/21/04), 864 So.2d 129. The trial court granted summary judgment in favor of Mr. Kite essentially on the basis that truth is an absolute defense against a defamation claim.

In *Kennedy v. Sheriff of E. Baton Rouge*, 05-1418, p. 25 (La.7/10/06), 935 So.2d 669, 686, our supreme court stated:

> [B]ecause of the chilling effect on the exercise of free speech, defamation actions have been found particularly susceptible to summary judgment. Summary adjudication, we have recognized, is a useful procedural tool and an effective screening device for avoiding the unnecessary harassment of defendants by unmeritorious actions which threaten the free exercise of rights of speech and press.

The evidence clearly established Alan, without his father's permission, raised his salary substantially and also unilaterally gave himself an unauthorized percentage of all revenues of Kite Bros., L.L.C. Further, it was undisputed that Alan, without permission, removed business documents from the Kite Bros., L.L.C. office. He also refused to return the records, despite his statement to the police that he would do so.

The trial court did not err in granting summary judgment dismissing Alan's claim for defamation.

### *Retaliatory Discharge.*

In this claim, Alan contended Kite Bros., L.L.C. violated state law by renting recreational vehicles. Alan stated he objected to this practice in September of 2005, and as such, when he left Kite Bros., L.L.C. four months later his departure gave rise to a retaliatory discharge claim under the Louisiana Whistleblower's statute, La.R.S. 23:967. We find no merit in Alan's position, and the trial court did not err in granting summary judgment on this issue.

Trial testimony revealed that the two contracts for renting recreational vehicles entered into by Kite Bros., L.L.C., were facilitated by Alan himself. Not only did Alan actively participate, if not orchestrate, the rental of the recreational vehicles, he has listed as one of his claims in the suit below the entitlement to ten percent of the funds realized from the lease of these vehicles. The trial court noted the folly of this argument, as "the Whistleblower Statute only offers protection to a specific class of employees: those employees who face 'reprisals' from their employers based solely upon an employee's knowledge of an illegal workplace practice and ***his refusal to participate in the practice or intention to report it***." *Hale v. Touro Infirmary*, 04-03, p. 6 (La.App. 4 Cir.11/3/04), 886 So.2d 1210, 1215, *writ denied*, 05-0103 (La.3/24/05), 896 So.2d 1036 (emphasis added). Thus,

7

Alan cannot be found to be a "good faith" whistleblower, which is a requisite condition on bringing a whistleblower claim. *Accardo v. Louisiana Health Services & Indemnity Co.*, 05-2377 (La.App. 1 Cir. 6/21/06), 943 So.2d 381.

Moreover, not only did Alan not cite his alleged complaint as a reason for his departure from Kite Bros., L.L.C., the record established Alan remained with the company for over four months after his supposed objection (September of 2005) to the leasing of the RVs. When he finally left in January of 2006, Kite Bros., L.L.C. had obtained a license to lease vehicles. Lastly, it was specifically testified to by Alan, that he "never threatened my father to turn him in." The trial court did not err in granting summary judgment dismissing Alan's claims for retaliatory discharge.

### Detrimental Reliance.

Alan sought a one percent ownership interest in Kite Bros., L.L.C. based on the doctrine of detrimental reliance. Louisiana Civil Code Article 1967 provides for the doctrine of detrimental reliance as follows:

> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

The doctrine of detrimental reliance is not favored in the law and all claims must be examined carefully and strictly. *Moroux v. Toce*, 06-831, 06-832 (La.App. 3 Cir. 11/2/06), 943 So.2d 1263, *writ denied*, 07-117 (La.3/16/07), 952 So.2d 698.

Alan's own testimony does not establish that he was ever promised a one percent ownership interest in Kite Bros., L.L.C. Although Alan claimed his father "made the statement [to Alan] that he wanted [Alan] to have a controlling interest over the business to keep it going," it was acknowledged this was a statement rather than any promise. Further, despite this claim of his reliance on a statement

8

made over twenty years ago of a potential ownership interest in the business, there have been several judicial admissions by Alan during the years that Mr. Kite was the sole owner of the company. In 1992, Alan filed to partition community property during a divorce, and represented to the court that he had no ownership interest in Kite Bros., Inc. In 1996, in another divorce proceeding, Alan again represented he owned no interest in Kite Bros., Inc. In a May 2003 application to the Louisiana State Policy Board, Alan certified that Mr. Kite owned "100%" of Kite Bros., L.L.C.

Moreover, there is no evidence that Alan ever changed his position as a result of the alleged promise. Both before and after the alleged promise Alan was an at-will employee. Alan even admitted this when asked how his position changed as a result of the alleged promise, he said he could not answer without speculating.

The trial court did not err in granting summary judgment on Alan's detrimental reliance claim.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to Plaintiff-Appellant, Alan Kite.

**AFFIRMED.**