PARRO, J.
|2In this workers’ compensation case, Amclyde Engineered Products Co., Inc. (Amclyde) and its insurer, Louisiana Insurance Guaranty Association (LIGA),[1] appeal a judgment in favor of Floyd D. Dubuisson, who was employed by Amclyde when he fell and sustained injuries. For the following reasons, we affirm the judgment in part and remand in part for further proceedings in accordance with the law and this opinion.
BACKGROUND
On March 24, 2000, while in the course and scope of his employment as a pipefit-ter with Amclyde, Dubuisson fell, injuring his neck. After conservative treatments produced no relief for the pain in his neck and right shoulder, in December 2002, Dr. John B. Logan, an orthopedic surgeon specializing in spine surgery, performed a cervical fusion on his neck. Although Dr. Logan deemed the surgery a success, after *894 some initial pain remission, Dubuisson experienced neck pain radiating into his right shoulder and arm. Consequently, he continued to receive treatment for his neck and right shoulder pain from Dr. Robert Fortier-Bensen, a pain management specialist who had treated him since the accident. In July 2003, Dubuisson was involved in a minor motor vehicle accident in which he struck the rear of another vehicle while under the influence of prescription medications. He admitted he was on medications, was handcuffed, and was taken to jail, where he became involved in a physical altercation with a jailer after being booked. All charges concerning the fight at the jail were eventually dropped, but he was convicted of DUI. After this incident, unless it was absolutely necessary for him to drive, Dubuisson depended on his wife and son for transportation.
Because Dubuisson continued to experience right shoulder pain, Dr. Logan ordered an MRI of the right shoulder without contrast, which was performed on August 14, 2003. That test showed degenerative changes of the acromioclavicu-lar joint, causing impingement into the supraspinatus tendon, possible tendinopa-thy in the | ¡¡rotator cuff, and the possibility of a partial tear. After years of treatment with no consistent relief from the right shoulder pain, Dr. Fortier-Bensen ordered another MRI. This test, an arthrogram, was done with contrast on October 30, 2007. The diagnostic report after this test concluded that there was a tear of the superior labrum extending from anterior to posterior and mild degenerative arthritis in the acromioclavicu-lar joint that appeared unchanged from August 2003.
In January 2008, Dubuisson consulted Dr. Brian L. Fong, an orthopedist, who diagnosed a superior labrum tear in his right shoulder and recommended arthroscopic surgery if cortisone injections did not relieve his pain. LIGA did not approve the surgery. In July 2010, Dr. For-tier-Bensen terminated Dubuisson as a patient, because he had tested positive for Xanax, which the doctor had not prescribed for him at that time.[2] Dubuisson paid out-of-pocket for all of his medical expenses after July 2010.
On November 17, 2010, LIGA terminated his supplemental earnings benefits, and on January 21, 2010, Dubuisson filed a disputed claim for benefits. In January 2011, Dubuisson received approval from LIGA to see Dr. Logan again for his continuing complaints of right shoulder pain. Dr. Logan agreed that the right shoulder needed surgery and that, after this had been done, the cervical area needed a further workup to determine whether there were disc problems above and below the earlier fusion. Dr. Logan referred him to Dr. Richard P. Texada, Jr., an orthopedic surgeon with a specialty in sports medicine, for treatment of his shoulder injury, and to Dr. Scott Sondes, a medical doctor with a specialty in physical medicine, rehabilitative medicine, and emergency room care, for pain management. Again, LIGA did not approve these referrals.
Following the trial on May 23, 2011, the workers’ compensation judge (WCJ) found that Dubuisson was an Amclyde employee in March 2000[3] when the accident oc *895 curred and that he had sustained injuries to his neck and right shoulder in the work-[related4 fall. The judgment ordered Am-clyde and LIGA to pay him temporary total disability benefits from November 18, 2010, at the rate of $884 per week, plus legal interest until paid, and further ordered payment of all medical bills and expenses, including any unpaid mileage, to either the health-care providers who remained unpaid or to Dubuisson, if he had paid those items out-of-pocket. The judgment further granted Dubuisson the right to change his choice of pain management physician to Dr. Sondes and to Dr. Texada for treatment of the neck and right shoulder, and also ordered Amclyde and LIGA to pay for continuing treatment, including surgery for the labrum tear in Dubuisson’s right shoulder. Amclyde and LIGA appealed that judgment, which was signed on August 31, 2011.
STANDARD OF REVIEW
In workers’ compensation cases, the appropriate standard of review to be applied by the appellate court to the WCJ’s findings of fact is the “manifest error-clearly wrong” standard. Dean v. Southmark Const., 03-1051 (La.7/6/04), 879 So.2d 112, 117. To uphold the WCJ’s finding of fact, the appellate court must find from the record that there is a reasonable factual basis for the finding of the trier of fact and that the record establishes that the finding is not clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trier of fact’s finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a factual finding only if, after reviewing the record in its entirety, it determines the factual finding was clearly wrong. See Stobart v. State, through Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La.1993); see also Dawson v. Terrebonne Gen. Med. Ctr., 10-2130 (La.App. 1st Cir.5/19/11), 69 So.3d 622, 626.
If the trial court’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse those findings even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Connor v. Family Dollar Store, 09-1537 (La.App. 1st Cir.3/26/10), 36 So.3d 339, 345, writ denied, 10-0959 (La.6/25/10), 38 So.3d 344. Where there is [¡^conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable. Robinson v. North American Salt Co., 02-1869 (La.App. 1st Cir.6/27/03), 865 So.2d 98,105, writ denied, 03-2581 (La.11/26/03), 860 So.2d 1139. Where there are two permissible views of the evidence, a fact finder’s choice between them can never be manifestly erroneous or clearly wrong. Richardson v. North Oaks Hosp., 11-1258 (La.App. 1st Cir.2/13/12), 91 So.3d 361, 365.
CAUSATION
Amclyde and LIGA contend Dubuisson’s right shoulder problem was not related to the March 2000 work accident, but was a new injury that occurred either in the automobile accident and/or the fight with the jailer in July 2003. They claim Du-buisson complained only of neck pain after his work injury and did not complain of right shoulder pain until after the July 2003 accident and confrontation. They also state that the labrum tear in Dubuis- *896 son’s right shoulder first showed up on the MRI in 2007; the MRI in 2003 did not show the tear, and a number of doctors could not relate the finding of the labrum tear to the original work injury. Therefore, Amclyde and LIGA conclude, Dubuis-son did not meet his burden of proving a legal/medical causal connection between the accident and the right shoulder injury. Thus, they should not be forced to pay for continuing treatment and surgery to correct the right shoulder labrum tear.
A workers’ compensation claimant bears the burden of establishing a causal connection between the work accident and the resulting disability by a preponderance of the evidence. Clark v. Godfrey Knight Farms, Inc., 08-1723 (La.App. 1st Cir.2/13/09), 6 So.3d 284, 292, writ denied, 09-0562 (La.5/29/09), 9 So.3d 163. An employee’s work-related accident is presumed to have caused his disability when the claimant proves that before the accident, he had not manifested his disabling symptoms; that commencing with the accident, disabling symptoms appeared; and that there is either medical or circumstantial evidence indicating a reasonable possibility of a causal connection between the accident and the disabling condition. Delatte v. Pala Group, LLC, 09-0913 (La.App. 1st Cir.2/10/10), 35 So.3d 291, 295, writ denied, 10-0562 (La.5/7/10), 34 So.3d 865.
This court will examine the evidence presented by Dubuisson to determine whether he met his burden of proving that, more probably than not, his current problems with his right shoulder were causally related to the accident at work. If there is medical and other evidence indicating a reasonable possibility of that causal connection, then the WCJ’s factual finding concerning this issue cannot be “clearly wrong” and cannot be overturned by this court.
Dubuisson testified at trial that he had pain in his neck and right shoulder and arm after the work-related accident. He reported this to the doctors who examined him immediately after the accident, including Dr. Fortier-Bensen, Dr. Bert R. Bratton, and Dr. Logan. On December 3, 2002, Dr. Logan performed a cervical fusion, which provided temporary relief for the pain in his neck, but not for the pain in his right shoulder and arm. Dr. Fortier-Bensen treated his shoulder pain by doing monthly facet injections in his neck; each of those injections would relieve the shoulder pain for about two weeks. An MRI without contrast was performed on his right shoulder in August 2003, and a second MRI with contrast, an arthrogram, was done in October 2007.
Dr. David Donaldson, a board-certified diagnostic radiologist at Ochsner Medical Center North Shore in Slidell, testified as an expert concerning his evaluation of the two MRIs and the radiology reports interpreting those tests. He stated that the radiologist who conducted the August 2003 test reported degenerative changes of the acromial clavicular joint, causing impingement into the supraspinatus tendon, an intermediate signal in the rotator cuff that could represent tendinopathy, and the possibility of a partial tear. The radiologist’s report concerning the October 2007 MRI concluded there was a “tear of the superior labrum extending from anterior to posteri- or” and mild degenerative arthritis in the acromial clavicular joint, which appeared unchanged from August 2003. Dr. Donaldson stated that in the 2007 tests, an initial series of images was done without contrast. Then the joint was injected with contrast fluid to light up all the small recesses of the joint, and another series of images was taken. In this |7seeond series, the contrast solution made the tear in the glenoid labrum clearly visible. Referring again to the radiologist’s report after the *897 2007 test, Dr. Donaldson noted that the radiologist looked at the 2007 images that were taken before injection of the contrast fluid and said he believed he could see the tear on those images. Dr. Donaldson then compared the 2007 pre-contrast images with the 2003 MRI images taken without contrast material, and stated that the appearance was the same in both of those images, leading him to believe that, more probably than not, there was a tear in Dubuisson’s glenoid labrum in 2003.
On cross-examination, Dr. Donaldson acknowledged that he believed the 2003 report’s reference to a possible tear involved the rotator cuff, not the glenoid labrum. Dr. Donaldson said that on the 2007 MRI pre-contrast images, there was an area in the proton density imaging that looked like the tear. When he compared that to the proton density imaging on the 2003 MRI, Dr. Donaldson could see something in the same area that looked like the tear. He said, “It’s only in retrospect with two sets of images and a further study that you can look back and think that there is a tear there.”
Dubuisson’s deposition, taken December 8, 2009, was admitted into evidence as a joint exhibit. Dubuisson said that on the day of the accident, he was working for Amclyde as acting foreman and was asked by a mechanic to check his work. Dubuis-son climbed on top of a level beam pile and checked the work. As he came down, he stepped off a concrete piling onto another one that had a pipe about six to eight inches long sticking out of the end of it. He said he stepped on the piling and went down to the ground, explaining further:
[M]y right foot slid and I thought I was going to hit that pipe. And I reached back. I twisted my whole body as hard as I could back to keep me from hitting that pipe on the end of the piling. I thought I was going to hit it, but I didn’t. I hit my butt, my hand hit the ground, and my feet, leg, went down. The ground was on an angle ... and I popped all the way from my back up to the base of my skull....
The following Monday, he made an accident report to his supervisor and was told to go to Pelican Urgent Care, which he did. After taking an x-ray of his neck, the radiologist there told him he could see something wrong in his neck, but could not tell what it was. Dubuisson then asked Amclyde to let him see his own pain management | ^doctor, Dr. Fortier-Bensen, who had done proiotherapy on his knee after ACL replacement surgery some years earlier. Dr. Fortier-Bensen referred him to Dr. Bratton, a neurosurgeon, for a myelo-gram of his cervical area. When the test results came in, Dr. Bratton told him he needed surgery, but said his neck would never be the same. Dr. Fortier-Bensen then referred him to Dr. Logan, who told him he could do the surgery, but said the disk above and below the fusion would probably go out in time. Dubuisson said that, before the surgery, his symptoms were “Excruciating neck pain, the stabbing in the shoulder feeling, burning down through ... [the] top of my shoulder.”
Dubuisson testified at the trial that he had seen Dr. Fortier-Bensen on a monthly basis ever since his accident for pain management for his neck and right shoulder, including facet injections that gave him some temporary relief. About September 2009, Dr. Fortier-Bensen could not see him due to his own illness, and the facet injections ceased. Dubuisson admitted that he took some Xanax that was not prescribed at that time by Dr. Fortier-Bensen; when a drug test revealed this, Dr. Fortier-Bensen terminated him as a patient in September 2010. Dubuisson was eventually able to And another pain management specialist, Dr. Joseph Mogan, *898 who was still treating his neck and shoulder pain at the time of trial. However, LIGA had not approved the transfer to Dr. Mogan, so Dubuisson was paying him out of pocket. In January 2011, he returned to Dr. Logan, who recommended he see Dr. Texada for treatment of the shoulder and Dr. Sondes for pain management. LIGA did not approve these referrals, and after November 2010, Dubuisson did not receive any more workers’ compensation benefits. Dubuisson stated that his right shoulder had been getting steadily worse ever since the neck surgery, even to the point of feeling like someone was stabbing a knife into his shoulder blade.
Dr. Fortier-Bensen’s deposition was taken in February 2010 and admitted into evidence as a joint exhibit. His notes from Dubuisson’s second visit to him on April 11, 2000, showed that Dubuisson reported right shoulder pain at that time, and this complaint showed up consistently in the records of subsequent visits. Dr. Fortier-(Bensenfl said he had no doubt that Dubuis-soris right shoulder was injured as a result of the work-related accident. Initial tests showed serious disc problems in the neck at C4-5, C5-6, and C6-7, and it was thought these were causing the right shoulder and arm pain. It was only after the cervical fusion that the doctors realized there was an independent cause of the right shoulder problem. On one of Du-buisson’s earliest visits to him, Dr. Fortier-Bensen’s notes show “guarded range of motion of the cervical spine, and right shoulder continues to cause him pain, he has a decreased range of motion of the right shoulder, pain, numbness, tingling associated.” He said this would also describe Dubuisson’s current condition as of the deposition date. Injections to his neck had taken care of some of the pain, but never improved his range of motion, ability to use his right shoulder, and weakness and dysfunction of his right upper extremity. Dr. Fortier-Bensen said that from the outset, Dubuisson had a neck problem and a shoulder problem and complained about the shoulder a great deal, even in the early days. As time went on, the shoulder pain consistently did not improve. So there was clearly something going on with the shoulder that needed to be addressed. Dr. Fortier-Bensen said that in hindsight, “it’s clear that his shoulder issue was a lot more involved than probably all of us imagined at the time.” He further stated that everything Dubuisson had ever told him concerning his injury was consistent with the diagnosis of a type 2 superior labral tear.
Dr. Logan’s deposition from February 2011 was also admitted as a joint exhibit. His notes showed that on Dubuisson’s first visit on May 2, 2002, he complained of cervical pain radiating down the right arm, and said his right hand and fingers would get numb. Dubuisson drew a pain diagram showing pain in his neck, his mid-back, and his right shoulder, as well as his fingers. On the June 17, 2002 visit, Dr. Logan’s notes showed Dubuisson’s complaints of neck pain were about the same, along with right shoulder and upper back pain. Those notes say that the “pain radiates primarily to the right shoulder girdle, out of the right tip of the acromion and down the medial border of the right shoulder.” On November 15, 2002, in the pre-surgery workup, Dr. Logan again noted pain radiating into the right trapezial and medial scapula region.
110Dr. Logan testified that after the cervical fusion surgery in December 2002, Dubuisson returned to his office on January 8, 2003. Dr. Susan Bryant, a physical medicine and rehabilitation physician who practiced with Dr. Logan, recorded that Dubuisson had muscle spasms and severe right shoulder problems. He was sent to physical therapy, where, at the first evalu *899 ation, there was decreased strength in the right shoulder and tenderness in the anterior bursa. Dr. Logan stated that all of those things certainly related to a shoulder derangement. On the May 2, 2003 visit, Dr. Logan’s handwritten notes show “neck, right shoulder, deep ache, and then under the exam, right shoulder pain with positive impingement, positive levator scapula pain.” The notes also show “trapezial motor point pain,” which he described as “pain right at the center of the shoulder.” Physical therapy notes from May 13 and 21 showed continuing treatment for the right shoulder. On June 6, 2003, Dr. Logan’s notes reflect that Dubuisson had right shoulder pain — a deep ache — also an indication of positive impingement. Those notes further stated that Dubuisson may need a right shoulder MRI and facet injections if it remained painful. Dubuisson’s last visit to Dr. Logan was on February 5, 2004, when he presented with right shoulder pain and with his right fingers numb. At that point, Dr. Logan noted that Du-buisson needed a repeat MRI of the cervical spine, a neurological evaluation, and a referral to Dr. Texada for the right shoulder rotator cuff.
Dr. Logan stated that the next time he met with Dubuisson was seven years later, on January 27, 2011, when he returned with complaints of continuing pain. Du-buisson described the location of the problem as the right shoulder, right upper arm, right hand, right fingertips, and right side of his neck. A repeat MRI of the cervical spine was recommended. Dr. Logan explained that the two-level anterior cervical diskectomy and fusion at the C4-5 and C5-6 levels that he had performed some eight or nine years earlier raised his concerns about the next or adjacent open segments being subject to increased force, resulting in breakdown above or below the fusion. (R405) Dubuisson returned to him with the MRI studies in early February 2011. Again he spoke of multiple problems, including difficulties with all activities of daily living and ^increased neck pain radiating to the right shoulder and right dominant arm. The MRI revealed some breakdown at the next open motion segment below his fusion, which was C6-7. Dr. Logan recommended treating the neck with selective facet injections to the two levels above and below the fusion, levels C3-4 and C6-7 bilaterally.
Regarding the comparison of the 2003 and 2007 MRIs and Dr. Donaldson’s opinion that the labral tear was present in both, Dr. Logan said, “Well, I would have suspected that anyway because a labral tear generally takes some type of force.” Dr. Logan summarized that “it is within medical reason, if he was complaining of shoulder pain after the accident, he certainly presented to me with shoulder pain and neck pain ... and [if] he was not complaining of severe shoulder symptomol-ogy prior to the accident, then it’s reasonable that the accident was a contributing factor to his shoulder pain.” [I]f he was working full-time and he says he began hurting after the accident, then that’s reasonable.”
After the 2007 MRI revealed the labral tear, Dubuisson was referred by Dr. Fortier-Bensen to Dr. Brian L. Fong, an orthopedic surgeon, whose clinic notes after the first visit in January 2008 state, “It does appear by the patient’s history and the accompanying documentation that the right shoulder injury is relatable to the work related injury of 2000_ His superior labral tear is consistent with a history of falling with him reaching out and grabbing something.” Dr. Fong’s treatment plan was to perform cortisone injections into the right shoulder. Dr. Fong tried the cortisone injections, but they did not provide the intended pain relief, and on July 31, 2008, he planned to set Dubuisson *900 up for right shoulder arthroscopy with distal claviculectomy and superior labral repair. That surgery was not approved.
The record is replete with notes from other physicians who examined Dubuisson or simply examined some of his records. Many of them said they could not relate the right shoulder labral tear to the 2000 accident. However, given Dubuisson’s testimony, Dr. Fortier-Bensen’s testimony and medical records, Dr. Logan’s testimony and medical records, Dr. Fong’s medical records, and Dr. Donaldson’s testimony, there is certainly reasonable evidence demonstrating that, more probably than not, Dubuisson’s right |12shoulder injury was caused by his fail at work. Moreover, our review of the record in its entirety does not indicate that this finding was clearly wrong. The WCJ had consistent medical evidence from Dubuisson’s treating physicians to support this finding, and her choice to assign more weight to the opinions of those doctors than to others whose evaluations are also in evidence cannot be clearly wrong. Therefore, this court must affirm the finding that Dubuis-son’s right shoulder injury was caused by his work-related fall.
CHANGE IN PHYSICIANS
Amclyde and LIGA contend that Du-buisson’s change in pain management specialists was not a medical necessity, but was necessitated by his failing a drug test and being terminated as a patient. They state that the Workers’ Compensation Act provides a defense against paying benefits when an employee tests positive for non-prescribed medication, citing LSA-R.S. 23:1081. They further contend that even if he were entitled to change pain management specialists, he would not be entitled to the services of two new physicians, citing LSA-R.S. 2S:1121(B)(1), and that his reimbursement, if any, for out-of-pocket payments for such treatments should be limited to $750, pursuant to LSA-R.S. 23:1142.
Addressing first the argument based on LSA-R.S. 23:1081, we note that this statute precludes compensation benefits only when the employee’s injury was caused by alcohol intoxication or the use of a non-prescribed controlled substance at the time of the injury. See LSA-R.S. 23:1081(1)(b) and (5). There is absolutely no evidence in this record that Dubuisson had ingested alcohol or had used illegal drugs at the time of his accident. Therefore, this argument lacks merit.
Regarding an employee’s right to choose his own physician, LSA-R.S. 23:1121(B)(1) states:
The employee shall have the right to select one treating physician in any field or specialty. The employee shall have a right to the type of summary proceeding provided for in R.S. 23:1124(B), when denied his right to an initial physician of choice. After his initial choice the employee shall obtain prior consent from the employer or his workers’ compensation carrier for a change of treating physician within that same field or specialty. The employee, however, is not required to obtain approval for change to a treating physician in another field or specialty.
|1sAn employer has a duty to furnish all necessary medical treatment resulting from an employee’s work-related accident. See LSA-R.S. 23:1203(A). This includes palliative treatment to relieve an employee of pain caused by a work injury. Jennings v. Ryan’s Family Steak House, 07-0372 (La.App. 1st Cir.11/2/07), 984 So.2d 31, 39. Dubuisson chose Dr. Fortier-Bensen as his pain management specialist and continued to be treated by him from April 2000 until July 2010, when he was dismissed for taking pain medications *901 that were not prescribed for him at that time.[4] However, not long after that dismissal, due to his own very serious illness, Dr. Fortier-Bensen was forced to close his practice, and Dubuisson no longer had a pain management specialist of his own choosing. In Wilzcewski v. Brookshire Grocery Co., 10-1148 (La.App. 3rd Cir.3/16/11), 59 So.3d 530, 546, the court concluded that when the claimant’s initial pain management specialist had discharged her, she was entitled to see another physician for pain management treatment. Accordingly, Dubuisson was entitled to choose another pain management specialist after his initial choice in that specialty was no longer available.[5]
In this case, Dr. Logan, who specialized in spinal surgery, referred Dubuis-son to Dr. Texada for treatment of his shoulder injury, because Dr. Texada was an orthopedic surgeon with a specialty in sports medicine. Dr. Logan also referred him to Dr. Sondes for pain management for the neck and shoulder, because he specialized in physical and rehabilitative medicine. Therefore, although the wording of the WCJ’s judgment does not make this distinction clear, the overall record shows that Dr. Sondes practiced pain management and was to serve as Dubuisson’s pain management physician, while Dr. Texada was to do whatever was necessary to treat the right shoulder injury, including surgery. Therefore, the WCJ did not err in requiring LIGA and Amelyde to approve both referrals, only one of which was for pain management.
| uLIGA and Amelyde further contend that payments for non-emergency diagnostic testing and treatment, including pain management, must be limited to $750, as stated in LSA-R.S. 23:1142, since there was no mutual consent of the payor and employee as to that treatment. The employer’s duty to furnish medical expenses is governed by LSA-R.S. 23:1203(A), which, in pertinent part, provides:
In every case coming under this Chapter, the employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedieal treatment recognized by the laws of this state as legal, and shall utilize such state, federal, public, or private facilities as will provide the injured employee with such necessary services.
Louisiana Revised Statutes 23:1142, in pertinent part, further provides:
B. Nonemergency care. (1) Except as provided herein, each health care provider may not incur more than a total of seven hundred fifty dollars in nonemer-gency diagnostic testing or treatment without the mutual consent of the payor and the employee as provided by regulation. Except as provided herein, that portion of the fees for nonemergency services of each health care provider in excess of seven hundred fifty dollars shall not be an enforceable obligation against the employee or the employer or the employer’s workers’ compensation insurer unless the employee and the *902 payor have agreed upon the diagnostic testing or treatment by the health care provider.
[[Image here]]
E. Exception. In the event that the payor has denied that the employee’s injury is compensable under this Chapter, then no approval from the payor is required prior to the provision of any diagnostic testing or treatment for that injury.
According to subsection E, when compens-ability is denied, no approval by the employer or payor is required for testing or treatment. Stewart v. Livingston Parish Sch. Bd., 07-1881 (La.App. 1st Cir.5/2/08), 991 So.2d 469, 475. The statute does not specify when or how a denial of compensa-bility must occur; it merely states that if the payor denies that an injury is compen-sable, the employee need not seek approval for medical treatment. Id.
In this case, LIGA and Amclyde consistently denied liability for any treatment for the right shoulder injury. Therefore, the denial of compensability triggered the exception in subsection E. Since we agree with the WCJ that Dubuisson proved that the right shoulder injury was caused by his work-related accident, he was entitled to all reasonable and necessary treatment for that injury without approval from LIGA and Amclyde. See Quick v. Terrebonne Gen. Med. Ctr., 09-1101 (La.App. 1st Cir.2/10/10), 35 So.3d 287, 290. Accordingly, the statutory limit on payments is not applicable.[6]
COMPENSATION BENEFITS
Amclyde and LIGA contend that Du-buisson should not have continued to receive supplemental earnings benefits (SEBs), because he was released for light duty or sedentary work by several physicians. Therefore, he did not prove he could not earn 90% of his pre-accident wages. They further note that LSA-R.S. 23:1221(3)(d) limits SEBs to 520 weeks, but they paid his benefits until November 18, 2010, which was beyond that time period. They claim that Dubuisson sabotaged a 2005 functional capacity evaluation in order to keep from having to return to work. Also, Amclyde and LIGA contend that, because Dubuisson did not prove that he could not engage in any occupation for wages, he did not establish his right to temporary total disability benefits (TTDs). Finally, they argue that the benefit rate to which they stipulated at trial, $384 per week, was incorrect and should be $349.60 per week.
Regarding Dubuisson’s entitlement to SEBs, the statute providing for those benefits is LSA-R.S. 23:1221(3). The threshold prerequisite to recovery of SEBs, as stated in subsection (3)(a) of that statute, is that the employee’s injury results in his inability to earn wages equal to ninety percent or more of the wages he was earning at the time of the injury. *903 Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1006-07 (La.1989); Carignan v. Louisiana Compressor Maint. Co., 02-0180 (La.App. 1st Cir.12/30/02), 836 So.2d 476, 480. The injured employee bears the burden of proving by a preponderance of the evidence that the injury resulted in his inability to earn that amount. Daigle, 545 So.2d at 1007. The analysis is necessarily a facts and ¡^circumstances one in which the court is mindful that workers’ compensation law is to be liberally construed in favor of coverage. Id. In determining if an injured employee has made a prima facie case of entitlement to SEBs, the court may and should take into account all those factors which might bear on the employee’s ability to earn a wage. Id. It is not until the employee successfully bears his burden of proving his disability and resultant inability to earn at least ninety percent of his pre-injury wages that the burden shifts to the employer who, in order to defeat the employee’s claim for SEBs or to establish the employee’s earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered or available to the employee in his or the employer’s community or reasonable geographic region. Carignan, 836 So.2d at 480.
An employee seeking TTDs in accordance with LSA-R.S. 23:1221(1)(c) must prove by clear and convincing evidence that he is physically unable to engage in any gainful occupation, whether or not the same type of work he was engaged in at the time of injury. Alexander v. Sanderson Farms, Inc., 08-2225 (La.App. 1st Cir.5/8/09), 17 So.3d 5, 10. Clear and convincing proof has been defined as an intermediate standard falling somewhere between the ordinary “preponderance of the evidence” civil standard and the “beyond reasonable doubt” criminal standard. Clear and convincing proof requires objective medical evidence of the disabling condition causing the employee’s inability to engage in any employment. The claimant must provide objective, expert testimony as to his medical condition, symptoms, pain, and treatment, in addition to personal testimony, in order to meet this standard. The factual finding of whether a claimant is entitled to TTDs is subject to the manifest error or clearly wrong standard of appellate review. Roussell v. St. Tammany Parish Sch. Bd., 04-2622 (La.App. 1st Cir.8/23/06), 943 So.2d 449, 457-58, writ not considered, 06-2362 (La.1/8/07), 948 So.2d 116; Delatte v. Pala Group, LLC, 09-0913 (La.App. 1st Cir.2/10/10), 35 So.3d 291, 298-99, writ denied, 10-0562 (La.5/7/10), 34 So.3d 865.
Dubuisson explained that his inability to perform work of any kind was due to the continuing severe pain in his neck and right shoulder, which was only partially relieved 117by pain medications and facet injections. He testified that he could not lift anything over five pounds and could no longer go fishing, mow his lawn, or help his wife with household chores. Because of the right shoulder pain, which radiated down to his elbow and caused numbness and tremors in his fingers, his entire right arm and hand were virtually useless. He stated, “To me, it’s dead weight.” Obviously, his previous work as a pipefitter or welder was totally impossible. In addition, the pain medications that he had to take impaired his ability to drive safely, as demonstrated by the July 2003 accident, making it necessary for him to rely on his wife and others for transportation. Dubuisson said he did not feel he could take a job, because he was not supposed to be driving while taking medication, and did not know how he could get to and from work every day. He said that he had been to jail once because of that and did not want to go *904 through that again in his life, stating, “I don’t like jail.” Dubuisson testified that he had applied for some of the jobs that vocational rehabilitation counselors had recommended for him, but once the prospective employers learned that he was on medication, they were not interested in him.
Both Dr. Fortier-Bensen and Dr. Logan supported Dubuisson’s claim that he was and had been completely unable to work because of continuing pain and the need to be on strong pain medications at all times. Dr. Fortier-Bensen’s medical records include a letter to LIGA’s attorney on December 20, 2002, stating that he had seen Dubuisson in the past for a knee problem, and he always made attempts to be at work and never looked for ways to get out of work. Dr. Fortier-Bensen further stated that every diagnostic work-up that had been done since the work-related accident indicated that Dubuisson could not return to work as a pipefitter.
Dr. Fortier-Bensen had signed a release for sedentary work at one point in Dubuis-son’s treatment, but stated in his deposition that his intention was to let him try something, so LIGA and Amclyde would realize that he was unable to perform even sedentary jobs. He later recanted this release and would not release Dubuisson for any work. Dr. Fortier-Bensen said, “at this point, he’s not capable of doing the job.” At the time of trial, Dubuisson was taking daily maximum doses of Lortab for pain, Soma for | ^muscle spasms, Paxil for depression and pain, Ambien for inability to sleep, and was also using Lidoderm patches for pain. Dr. Fortier-Bensen stated:
I don’t know how anybody with the amount of pain he’s had would have survived if he hadn’t had the medicines. Because, having had pain, myself, this is something that gets to the point where it just wears you down, not from a standpoint of Cortisol levels, but also just from never getting good rest because you can’t sleep well at night.
He said Dubuisson also suffered from depression, which is “pretty consistent with people with chronic pain.” The pain, the medications, the depression, and the inability to sleep would all interfere with his ability to do any of the jobs recommended by a vocational rehabilitation specialist. Dr. Fortier-Bensen noted that the ability to drive was always a difficult issue, because pain could make a person’s ability to drive just as bad as that of someone who takes medicine. He concluded that “the patient remains still temporarily totally disabled.”
Asked if Dubuisson could return to work, Dr. Logan said he could possibly do some sedentary work, but based on his exam, Dr. Logan would say no to Dubuis-son’s ability to do a forty-hour work week with his right shoulder pain and neck pain without excessive absences. Also, he would surely be on narcotics for pain management. Dr. Logan said, “I would not release him for duty. He’s unfit for duty at this time.” He clarified his earlier comments by saying, “By the truest letter of sedentary, I’ve never seen the type of work that he might be able to do available, in reality.” Dr. Logan also said he would not release Dubuisson to work until they got through with the treatments to the new cervical problem and newly diagnosed right shoulder problem.
On cross-examination, Dr. Logan said, “Well, the first time I saw him, he had something wrong with his shoulder, in plain English.” Asked if Dubuisson could do sedentary work now, Dr. Logan said, “[I]n my experience, you’re going to have ... probably significant absences, probably need for transportation, need for changing positions frequently, on narcotic *905 medication, and a really reduced hours a week. It just doesn’t become practical.” “[W]e have to go by the thing, if you’re on narcotics, you can’t operate heavy equipment, drive — or I can’t recommend it.” Both doctors recognized that the right shoulder problem had been there from the beginning after [ 19Pubuisson’s fall, but had not been properly diagnosed, resulting in the treatments being focused on his neck. Dr. Logan said Dubuisson was unfit for any kind of work and could not be considered for release until after the right shoulder surgery and a follow-up evaluation of his neck condition.
The record does include opinions from other physicians and vocational rehabilitation counselors who concluded Dubuisson could perform sedentary work. However, the WCJ had this information when she considered his entitlement to continuing benefits. In addition to his own testimony, Dubuisson provided objective expert testimony as to his medical condition, symptoms, pain, and treatment options from Dr. Fortier-Bensen and Dr. Logan. These doctors, who provided the vast majority of his treatments, agreed that the right shoulder injury had existed since his work-related accident and that its severity and the pain medications required to treat it precluded Dubuisson’s ability to perform any work. Therefore, Dubuisson carried his burden of proving that he was entitled to TTDs, and our review of the record as a whole demonstrates that the WCJ’s award of those benefits was not manifestly erroneous.
With respect to the amount of monthly benefits, the parties jointly stipulated that the monthly benefit amount was $384. There is no evidence in the record showing any lesser amount. Therefore, the WCJ correctly awarded that amount, retroactive to the date benefits were discontinued.
REMAND
In addition to TTDs, the WCJ awarded Dubuisson “all medical bills and expenses, including any unpaid mileage, at issue herein pertaining to the right shoulder and neck and same shall be paid by defendant to the healthcare provider, if unpaid, and reimbursement to claimant for those medical bills and expenses paid by claimant .... ” However, the judgment does not reflect the specific dollar amounts that Amclyde and LIGA are to pay to the healthcare providers and/or to Dubuisson. Accordingly, we find it necessary to remand this case for a full hearing to determine those amounts. After that hearing, the WCJ is to render a new judgment reflecting the specific dollar |¡>namounts that must be paid for the medical expenses connected to Dubuisson’s work-related injuries to his neck and right shoulder. See Stewart, 991 So.2d at 479.
CONCLUSION
For the above reasons, we affirm in part the judgment of August 31, 2011. However, we remand the case in part for further proceedings consistent with the law and this opinion concerning a full hearing and a new judgment determining the exact dollar amounts of medical bills and expenses to be paid to healthcare providers or to be reimbursed to Dubuisson by Amclyde and LIGA. All costs of this appeal are assessed to Amclyde and LIGA.
AFFIRMED IN PART; REMANDED IN PART.
WELCH, J., concurs.

. LIGA is the successor insurance association to the failed Reliance Insurance Company, which had provided workers’ compensation insurance to Amclyde.

. Dr. Fortier-Bensen was extremely ill with a parasitic wasting disease at this time and had not been at his clinic to give Dubuisson facet injections to relieve his shoulder pain. He eventually closed his practice and referred Dubuisson to other pain management specialists.

. The judgment states that the injury occurred on March 24, 2010; however, this appears to be a typographical error, since all the evi *895 dence indicates the accident occurred on March 24, 2000.

. Dr. Fortier-Bensen had prescribed Xanax for Dubuisson, but had discontinued that prescription some time earlier. Dubuisson took some of the left-over Xanax and some valium given to him by a friend.

. Dubuisson could not function without some kind of pain treatment, and eventually began seeing Dr. Joseph J. Mogan, III, for whose services he paid out-of-pocket, because LIGA would not approve the transfer to him. However, Dubuisson did not get the pain relief he needed from Dr. Mogan, and did not really “choose” him for pain management. Dr. Mo-gan was simply the only available alternative, since other doctors consulted by Dubuisson were too expensive, and LIGA never approved the referral to him or Dr. Sondes.

. The payments would include those set out in LSA-R.S. 23:1203(D), which provides:
In addition, the employer shall be liable for the actual expenses reasonably and necessarily incurred by the employee for mileage reasonably and necessarily traveled by the employee in order to obtain the medical services, medicines, and prosthetic devices, which the employer is required to furnish under this Section, and for the vocational rehabilitation-related mileage traveled by die employee at the direction of the employer. When the employee uses his own vehicle, he shall be reimbursed at the same rate per mile as established by the state of Louisiana for reimbursement of state employees for use of their personal vehicle on state business. The office shall inform the employee of his right to reimbursement for mileage.
See Quick, 35 So.3d at 290.