McClendon, j.
|2In this workers’ compensation case, an employer appeals the judgment of the Office of Workers’ Compensation (OWC) in favor of the employee. For the reasons that follow, we affirm,
FACTUAL AND PROCEDURAL HISTORY
On September 9, 2010, Gabrielle Marie Louisa Chatagnier was employed as a Senior Team Leader/Receptionist for 1st A Southeast Incs, L.L.C. (1st A Southeast), a company providing services for the elderly and mentally challenged. Ms. Chatagnier worked in the Houma office, under the supervision of the main office in Gretna. Ms. Chatagnier testified that she worked as a receptionist at 1st A Southeast in the mornings from 8 a.m. to noon and then as a senior team leader from noon to 4 p.m.[1] She stated that she did not clock out for lunch. Ms. Chatagnier also testified that having transportation was a prerequisite of her job and that she did a lot of driving with her job, for which she received $80.00 per month for gas.
On the morning of September 9, 2010, Ms. Chatagnier received a call on the office telephone from Sonya Geason, an employee based in the Gretna office. Ms. Geason asked Ms. Chatagnier if she could pick up a canister from Burke’s Outlet Store for her. Ms. Geason mentioned that she and Stephanie Jackson, the owner of 1st A Southeast, had forgotten to pick it up when they were in Houma the day before. Ms. Geason did not tell Ms. Cha-tagnier what the canister was for.
Ms. Chatagnier went out to lunch that day with a co-employee for her birthday. After lunch, instead of making the turn to return to the office, Ms. Chatagnier passed the office and proceeded on Tunnel Boulevard towards Burke’s Outlet to pick up the canister. While she was stopped at a traffic light at the intersection of Tunnel Boulevard and Polk Street, the vehicle Ms. Chatagnier was driving was rear-ended.
| (¡On May 5, 2011, Ms. Chatagnier filed a disputed claim for compensation, seeking the payment of wage benefits and medical bills, as well as authorization for future medical treatment. Ms. Chatagnier alleged that she suffered injuries to her neck, head, and back and that at the time of the accident she “was on a mission from [her] employer to Burke’s Outlet to obtain a metal canister for corporate.” 1st A Southeast answered, denying that Ms. Chatagnier was in the course and scope of her employment at the time of the injury and also denying that her injuries were related to or caused by the accident.
Following a trial on April 3, 2012, the OWC found that Ms. Chatagnier was acting in the course and scope of her employment at the time of the automobile accident and that she suffered injury as a result of the accident. The OWC determined that 1st A Southeast was liable for Ms. Chatagnier’s medical expenses.[2] The *1171 OWC also ordered 1st A Southeast to pay continuing indemnity benefits from the date Ms. Chatagnier left her employment, on October 14, 2010, until there was a material change in circumstances.[3] Additionally, the OWC authorized the recommended surgery on Ms. Chatagnier’s lumbar spine and ordered that 1st A Southeast pay for the surgery, as well as all reasonable and necessary treatment incidental to the surgery. Judgment was signed on April 13, 2012, and 1st A Southeast appealed, urging two assignments of error:
1. The [OWC] made an error of law in determining that the claimant proved course and scope of employment based upon her perception or belief that she was on a business mission at the time of her motor vehicle accident when the correct legal standard of proof is not based upon the claimant’s perception but on the actual facts of the case.
2. Alternatively, Claimant failed to prove a causal connection between the [motor vehicle accident] and her injury/disability because she was not forthcoming about her prior injuries and treatment.
^DISCUSSION
Standard of Review
In workers’ compensation cases, the appropriate standard of review to be applied by the appellate court to the OWC’s findings of fact is the “manifest error-clearly wrong” standard, Dean v. Southmark Const., 03-1051 (La.7/6/04), 879 So.2d 112, 117. For an appellate court to reverse a factual finding of the OWC, it must find from the record that a reasonable factual basis does not exist for the finding and that the record establishes that the finding is clearly wrong. See Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the reviewing court must do more than simply review the record for some evidence that supports or controverts the OWC’s finding. The reviewing court must review the record in its entirety to determine whether the OWC’s finding was clearly wrong or manifestly erroneous. Dawson v. Terrebonne General Medical Center, 10-2130 (La.App. 1 Cir. 5/19/11), 69 So.3d 622, 626.
The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one. Stobart, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Dawson, 69 So.3d at 626-27.
Course and Scope
1st A Southeast initially argues that the OWC erred in concluding that Ms. Chatagnier was in the course and scope of her employment at the time of her motor vehicle accident. Specifically, 1st A Southeast contends that the OWC erred in find *1172 ing that because Ms. Chatagnier reasonably perceived that she was on a business mission she was in the course and scope of her employment | ¡¡entitling her to benefits under the Workers’ Compensation Act. 1st A Southeast maintains that Ms. Cha-tagnier was required to prove that she was actually “actively engaged in the performance of her duties.” However, Ms. Cha-tagnier argues that she was on a specific mission for 1st A Southeast and that she was doing work for her employer under circumstances where 1st A Southeast’s consent could be fairly implied. Thus, according to Ms. Chatagnier, she was within the course and scope of her employment at the time of the accident.
Under the Workers’ Compensation Act, employers are responsible for compensation benefits to employees only when the injury results from an accident “arising out of and in the course of his employment.” LSA-R.S. 28:1031; McLin v. Industrial Specialty Contractors, Inc., 02-1539 (La.7/2/03), 851 So.2d 1135, 1139. The requirement that an employee’s injury occur “in the course of’ employment focuses on the time and place relationship between the injury and the employment. McLin, 851 So.2d at 1139-40. An accident occurs in the course of employment when the employee sustains an injury while actively engaged in the performance of his duties during work hours, either on the employer’s premises or at other places where employment activities take the employee. McLin, 851 So.2d at 1140; Mundy v. Department of Health and Human Resources, 593 So.2d 346, 349 (La.1992). The requirement that an employee’s injury “arise out of’ the employment relates to the character or origin of the injury suffered by the employee and whether this injury was incidental to the employment. McLin, 851 So.2d at 1140.
The terms “arising out of’ and “in the course of’ found in LSA-R.S. 23:1031 are dual requirements that cannot be considered in isolation from each other. Guillory v. Interstate Gas Station, 94-1767 (La.3/30/95), 653 So.2d 1152, 1154; Martin v. Pride Offshore Co., Inc., 05-2373 (La.App. 1 Cir. 11/3/06), 950 So.2d 805, 808. In a close case, a strong showing made with reference to one requirement may compensate for a weak showing with reference to the other requirement. However, when there is a weak showing |fiwith respect to both requirements, the employee is not entitled to compensation benefits. Guillory, 653 So.2d at 1154; Martin, 950 So.2d at 808.
Generally, injuries sustained by an employee while traveling to and from work are not considered to have occurred within the course and scope of employment, and thus, are not compensable under the Workers’ Compensation Act. This rule, often called the “going-and-coming rule,” is premised on the theory that, ordinarily, the employment relationship is suspended from the time the employee leaves work to return home until he resumes his work. McLin, 851 So.2d at 1140; Martin, 950 So.2d at 808. However, this rule has been subject to a number of jurisprudentially established exceptions. For example, these exceptions have arisen: (1) if the accident happened on the employer’s premises; (2) if the employee was deemed to be on a specific mission for the employer, such as making a trip in the interest of his employer’s business or pursuant to his employer’s order; (3) if the employer had interested himself in the transportation of the employee as an incident to the employment agreement either by contractually providing transportation or reimbursing the employee for his travel expenses; (4) if the employee was doing work for his employer under the circumstances where the *1173 employer’s consent could be fairly implied; (5) if the employee was hurt while traveling to and from one worksite to another; (6) if the employee was injured in an area immediately adjacent to his place of employment and that area contained a distinct travel risk to the employee; and (7) if the operation of a motor vehicle was the performance of one of the duties of the employment of the employee. McLin, 851 So.2d at 1140 n. 1.
At trial, Ms. Chatagnier testified that, while Ms. Jackson was her employer and boss, she also considered Ms. Geason “a boss.” She stated that Ms. Geason had given her orders before and she thought Ms. Geason was “second in command.” Ms. Chatagnier also said that whenever Ms. Jackson came to Houma, Ms. Geason was with her.
Ms. Chatagnier testified that when Ms. Geason called her on the morning of September 9, 2010 to pick up the canister, Ms. Geason did not tell her what |7the canister was for, but that Ms. Geason had never before asked her to run a personal errand. Ms. Chatagnier stated that she felt as though she could not refuse the request and stated, “I thought it was coming as a direct command.” Ms. Chatagnier further testified that she did not get the feeling from Ms. Geason that the canister was for personal use and said she would not have gotten it if she had known it was a personal errand for Ms. Geason.[4]
Ms. Geason admitted that she had never asked Ms. Chatagnier to run a personal errand for her before September 9, 2010. She also acknowledged that she had called the Houma office in the past at Ms. Jackson’s request with instructions. She admitted that she did not tell Ms. Chatagnier what the canister was for. However, in her mind, Ms. Geason gave Ms. Chatagnier no reason to believe that the request was a corporate request when made. In her testimony, Ms. Jackson acknowledged that Ms. Geason had on past occasions communicated Ms. Jackson’s instructions to the Houma office.
In its reasons, the OWC stated: ■
So we have a history of acknowledgment that [Ms. Geason] is basically the mouthpiece for the owner at times. And [Ms. Geason], who is saying it was a personal errand, did not explain to Ms. Chatagnier the details. And so here you have a mouthpiece for the boss, calling an employee, not explaining what it was for, telling the employee to go get this.
The OWC evaluated the testimony, as well as the documentary evidence, presented at trial and concluded that Ms. Chatag-nier was in the course and scope of her employment at the time of the accident. Based on the totality of the circumstances, including credibility determinations, the OWC believed Ms. Chatagnier’s version of events that this was a specific mission for her employer, pursuant to her employer’s order. After our own thorough review of the record and relevant jurisprudence, we cannot find that the OWC’s finding that Ms. Chatagnier was acting in the course and scope of her employment with 1st A | ¡¿Southeast at the time of her automobile accident on September 9, 2010, was manifestly erroneous or clearly wrong.
Causation
Alternatively, 1st A Southeast challenges the finding of the OWC that Ms. Chatagnier’s injuries were causally related to her accident. In particular, 1st A Southeast asserts that Ms. Chatagnier had prior *1174 back and neck problems that she failed to disclose during discovery. Further, 1st A Southeast contends that by failing to reveal a previous knee injury to Dr. McAllis-ter, Dr. McAllister did not have a complete medical history and, therefore, could not determine which of Ms. Chatagnier’s conditions were pre-existing.
A workers’ compensation claimant bears the burden of .establishing a causal connection between the work accident and the resulting disability by a preponderance of the evidence. Clark v. Godfrey Knight Farms, Inc., 08-1723 (La.App. 1 Cir. 2/13/09), 6 So.3d 284, 292, writ denied, 09-0562 (La.5/29/09), 9 So.3d 163. An employee’s work-related accident is presumed to have caused his disability when the claimant proves that before the accident, he had not manifested his disabling symptoms; that commencing with the accident, disabling symptoms appeared; and that there is either medical or circumstantial evidence indicating a reasonable possibility of a causal connection between the accident and the disabling condition. Delatte v. Pala Group, LLC, 09-0913 (La.App. 1 Cir. 2/10/10), 35 So.3d 291, 295, writ denied, 10-0562 (La.5/7/10), 34 So.3d 865. Dubuisson v. Amclyde Engineered Products Co., Inc., 12-0010 (La.App. 1 Cir. 12/31/12), 112 So.3d 891, 2012 WL 6758006. Causation is not necessarily and exclusively a medical conclusion. It is usually the ultimate fact to be found by the fact finder based on all credible evidence. Magee v. Abek, Inc., 04-2554 (La.App. 1 Cir. 4/28/06), 934 So.2d 800, 806, writ denied, 06-1876 (La.10/27/06), 939 So.2d 1287.
A worker’s testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker’s version of the incident; and (2) the 19worker’s testimony is corroborated by the circumstances following the alleged incident. Bruno v. Harbert Intern., Inc., 593 So.2d 357, 361 (La.1992); Roberts v. Thibodaux Healthcare Center, 05-0774 (La.App. 1 Cir. 3/24/06), 934 So.2d 84, 92. Corroboration of the worker’s testimony may be provided by the testimony of co-workers, spouses, friends, or by medical evidence. Bruno, 593 So.2d at 361. Barring circumstances that cast suspicion on the reliability of the worker’s uncontradicted testimony, the OWC should accept the testimony as true when determining whether the worker has discharged his or her burden. Roberts, 934 So.2d at 92. The OWC’s determinations as to whether the worker’s testimony is credible and whether the worker has discharged his or her burden of proof are factual determinations, which are not to be disturbed on review unless clearly wrong or manifestly erroneous. Delatte, 35 So.3d at 295.
Thus, we will examine the evidence presented by Ms. Chatagnier to determine whether she met her burden of proving that, more probably than not, her current neck and back problems were causally related to the accident that occurred while she was in the course and scope of her employment. If there is medical and other evidence indicating a reasonable possibility of that causal connection, then the OWC’s factual finding concerning this issue cannot be “clearly wrong” and cannot be overturned by this court.
At trial, Ms. Chatagnier testified that when she was rear-ended her “body moved around like a pinball.” She stated that her neck was burning, but at that point in time, she was not feeling anything in her back. Later that day, Ms. Chatagnier went to the emergency room at Terre-bonne General Medical Center (TGMC), complaining of pain in her neck and shoulders. Ms. Chatagnier also stated that after the accident she began having migraine *1175 headaches, which she acknowledged she previously experienced. Having been under his care before, Ms. Chatagnier sought treatment with her chiropractor, Dr. Beau I. Porche, about a week after the accident for her aches and pains from the accident. Ms. Chatagnier testified that she treated with Dr. Porche for approximately eight months before being referred to Dr. Phillip V. McAllister, a neurosurgeon. Ms. 110Chatagnier also testified that after about three to four months she began seeing her family doctor, “when the pain became unbearable.” Ms. Chatagnier stated that the pain at first was in her neck, but as months went by, it also moved to her lower back and into her legs. She said that after Dr. McAllister conducted his testing, he informed her that she needed fusion surgery on her lower back.
Ms. Chatagnier also testified that she tried to return to work in May 2011 at a company similar to 1st A Southeast. She left the job after one week, because she could not perform her duties due to the pain. Ms. Chatagnier stated she again tried employment on a part-time basis at another similar company, but after about a month, her leg gave way one evening in a client’s home, and she felt she had to quit. She has not tried to return to employment since then.
Ms. Chatagnier also discussed two previous motor vehicle accidents in which she was involved. The first was in 2000, where she had complaints of pain in her chest and neck and of some bruising and swelling. Ms. Chatagnier testified that after a visit to the emergency room, she received no further treatment for that accident and that she had no residual symptoms. Ms. Chatagnier was also involved in another accident in 2003, wherein she was rear-ended and sought medical treatment at the emergency room at Lady of the Sea General Hospital for neck pain. She testified that after the emergency room visit she did not seek medical treatment of any kind until she had a slip-and-fall accident at a Winn-Dixie in September 2008 and injured her knee. Ms. Chatagnier stated that she tore her anterior cruciate ligament (ACL) and was treated by Dr. Porche, who referred her to Dr. Kenneth N. Adatto, an orthopedist. She stated she saw Dr. Adatto one time, who told her that she needed surgery on her knee. Ms. Chatagnier admitted on cross-examination that she chose not to have the surgery, preferring physical therapy instead. She also admitted discussing with Dr. Adatto that she had lower back and neck pain, as well as numbing and tingling in her arms, but was told that because of her knee injury she was overcompensating to her left side. Ms. Chatagnier stated that she continued to treat with Dr. Porche for her knee through September 2009. She | nalso admitted that around 2005 she suffered a pulled a muscle in the middle of her back, but that it resolved. Ms. Chatagnier further testified that she had never been diagnosed with a permanent cervical or lumbar disc condition before September 9, 2010, and had never had an MRI or other testing of her neck or back before the accident in question.
On review of the record, we note that neither Dr. Porche nor Dr. McAllister testified at trial or by deposition. However, their respective medical records pertaining to Ms. Chatagnier were introduced.[5] The medical records show that Dr. Porche of Houma-Thibodaux Spine & Rehabilitation first saw Ms. Chatagnier after the September 9, 2010 accident on September 13, *1176 2010, when she complained of neck and lower back pain due to a motor vehicle accident. Ms. Chatgnier followed treatment with Dr. Porche two to three times a week for several months. During that time, Dr. Porche requested that MRIs of Ms. Chatagnier’s cervical spine and lumbar spine be performed. The cervical spine MRI was conducted on December 8, 2010, and showed “mild disc bulging at C4-5 and C5-6” and “mild bilateral facet arthropathy at C5-6.” The MRI of Ms. Chatagnier’s lumbar spine was performed on March 18, 2011, and showed “disc bulging at L5-S1 narrowing the lateral recesses bilaterally and the neural foramen bilaterally” and “disc bulging at L4-5 with an annular tear at the 6 o’clock position.”
Dr. McAllister first examined Ms. Cha-tagnier on June 13, 2011. His initial impression was cervical spondylosis without myelopathy or radiculopathy, lumbar HNP with radiculopathy, and sciatica. He recommended a myelogram, lumbar spine CT, and x-rays for further diagnostic evaluation of her lumber spine. Dr. McAllister next saw Ms. Chatagnier on August 23, 2011, after the tests were performed, and recommended “an anterior approach for an L5/S1 Anterior Lumbar Interbody Fusion.” On October 18, 2011, Ms. Chatagnier returned to see Dr. McAllister, who commented at this visit that “[u]pon reevaluation of the | |2MRI imaging for today’s visit, there is evidence of L3-4 which shows question of nerve root compression and question of stability.” It was his recommendation to proceed "with the L5/S1 Anterior Lumbar Interbody Fusion. He discussed the surgical and non-surgical options with Ms. Chatagnier, who wished to proceed.
In its reasons, the OWC found that Ms. Chatagnier’s migraine headaches were not related to the accident, but found that her neck and back conditions were related. The OWC then stated:
Knee is not related. Now Dr. McAl-lister will have to separate out: If you have nerve damage from a disc and you have radiculopathy, or you have back-related consequences in the leg versus a torn ACL complications for not having surgery, he’s got to separate that out. So the knee itself is not related.
And if there is going to be treatment for any type of radiculopathy, there’s not usually treatment for the leg. Usually, when you have the surgery on the back, that fixes the leg. So I’m not necessarily treating the leg. You treat the back to help the leg. So I’m going to limit it to that type of claim.
Upon our thorough review of the record, we cannot say that the OWC lacked a reasonable factual basis for the finding that Ms. Chatagnier’s work-related accident caused her neck and back conditions, warranting an award of workers’ compensation and medical benefits, including surgery. Therefore, we are constrained to find that the OWC was not clearly wrong.
CONCLUSION
After a thorough review of the record, we find a reasonable basis to support the OWC’s factual determination that Ms. Chatagnier was injured as a result of an accident while she was in the course and scope of her employment with 1st A Southeast. Therefore, we find no error in and hereby affirm the April 13, 2012 judgment of the OWC. All costs of this appeal are assessed to 1st A Southeast Ines, L.L.C.
AFFIRMED.

. As a senior team leader, Ms. Chatagnier testified that she worked with clients in their homes. This might also include picking up miscellaneous items to assist clients with the activities of their daily living, such as diapers, gloves or whatever the case might be.

. The OWC specifically found that Ms. Cha-tagnier’s pre-existing conditions relating to *1171 her knees and migraine headaches were exempted from the injuries deemed to be caused by the accident.

. Ms. Chatagnier did not return to her employment with 1st A Southeast after October 14, 2010, when she was placed on medical leave by Beau I. Porche, D.C., of Houma-Thibodaux Spine & Rehabilitation.

. Ms. Chatagnier also argued that because 1st A Southeast's purpose was to assist clients with activities of daily living, such a request was not so out of the ordinary or unique so that she would question its purpose,

. Other medical records were introduced as well, including those of her family doctor, Dr. Camille Pitre of Lady of the Sea Clinic; Ter-rebonne General Medical Center; Dr. Edgar L. Feinberg, II; Our Lady of the Sea Hospital; and Dr. Kenneth N. Adatto.