# LOUISIANA
## COURTS OF APPEAL REPORTS
### VOLUME 5

## CASES ARGUED AND DECIDED IN THE COURTS OF APPEAL OF LOUISIANA

### AT TERM BEGINNING OCTOBER, 1926

No. 2152

Second Circuit

COCHRAN vs. PELICAN WELL TOOL AND SUPPLY COMPANY

(June 30, 1926. Opinion and Decree.)
(Oct. 4, 1926, Rehearing Refused.)
(Nov. 3, 1926. Writs of Certiorari and Review Denied by Supreme Court.)

*(Syllabus by the Court)*

1. **Louisiana Digest—Tender—Par. 1, 6.**
A previous tender is not a condition precedent to defendant's pleading in its answer a redhibitory defect in a suit for the purchase price of a bailing line that is wholly and entirely worthless when defendant has notified plaintiff that the line is being held subject to defendant's order and when the cost of returning it to defendant would exceed the value of the line. •

Nicol vs. Jacoby 157 La. 758, 103 South. 33.

Hawkins vs. Brown, 3 Rob. 310.

State vs. Hackley, Hume & Joyce, 124 La. 854, 50 South. 772.

Holcomb & Hoke Mfg. Co. vs. Theodore, 1 La. App. 445.

Appeal from the First Judicial District Court of Louisiana, Parish of Caddo. Hon. J. H. Stephens, Judge.

Action by Joseph W. Cochran, et al., Liquidators, against Pelican Well Tool and Supply Company.

Wilkinson, Lewis & Wilkinson, of Shreveport, attorneys for plaintiffs, appellees.

Crain, Jackson & Johnston, of Shreveport, attorneys for defendant, appellant.

### STATEMENT OF THE CASE

REYNOLDS, J. This is a suit by the liquidators of the Williamsport Wire Rope Distributing Company to recover $284.00 from Pelican Well Tool and Supply Company on open account.

The only item in dispute is one bailing line ordered by defendant from Williamsport Wire Rope Distributing Company for its customer, Gerald M. Ponton, and received by him at the express office and carried to the Lloyd Harris Drilling Company's lease and which line defendant alleges was worthless.

Defendant denied liability on the ground:

"That the said line was sold by the said Williamsport Wire Rope Distributing Company through its local agent to the defendant at the time alleged as a bailing line; that said line was purchased by defendant for a regular customer of defendant, Gerald M. Ponton, and was immediately delivered to the said Gerald M. Ponton; that the said Gerald M. Ponton, promptly upon receipt of said line, at-

tempted to use the same for the purpose for which it was designed and sold; that notwithstanding the exercise of all care and prudence the said line could not be used as a bailing line or for the purpose for which it was sold, but that on account of defective and faulty construction said line was wholly worthless and useless for the purpose for which it was intended and purchased. That said fact was notified immediately to your petitioner, who in turn promptly notified the local representative of said Wililamsport Wire Rope Distributing Company, viz.: A. B. Geren, and that said representative, acting in his capacity as such representative, made an examination of said line a short time after its sale and advised your petitioner and the said Gerald M. Ponton to hold said line subject to his order or the order of the Williamsport Wire Rope Distributing Company. It further avers that the said representative advised your petitioner that the said Williamsport Wire Rope Distributing Company would replace the said line."

On these issues the case was tried and there was judgment in favor of the plaintiff and against defendant for the amount sued for, and defendant has appealed. The right of defendant to sue for diminution of the purchase price was reserved to it.

### OPINION

The first question to be decided in this case is, was the bailing line in question worthless?

G. M. Ponton testified, pages 5, 6, 7, 8, 9, 11, 14, 15, 25:

"Q. What efforts did you make to use the bailing line after it arrived?

"A. After we unwrapped it and rolled it on our drum to attach to the bailer, we started in with the bailer probably fifty feet when the line started to wind up, twist on itself and twirl, and it twisted so that it pulled the bailer up to the crown block. After that we took the bailer off and unwrapped the twist and pulled it out through the wood thirty-five

hundred feet with two teams of mules and then pulled it in with the engine, and in that way we thought we would keep it from twisting, but it didn't help it at all, and when we rerun it the very same thing happened.

\* \* \* \*

"Q. Why did you cut off that three hundred feet?

"A. It snarled so we couldn't get it off of the floor. It wound around two of the men and came near killing them there on the floor; wound around them so that we had to cut it for that reason alone.

"Q. To save their lives?

"A. Yes, sir.

\* \* \* \*

"Q. Well, I will ask you to state whether or not that line was of any value whatever as a bailing line?

"A. No, sir; it was absolutely defective as a bailing line and could not have been used as a bailing line in any well or under any condition.

"Q. You say that it could not be used for a bailing line at all under any condition?

"A. No, sir.

"Q. Why do you state that?

"A. It snarled so badly you could not use it. When a line snarls like that it is impossible to use it.

"Q. Well, what did this line do when you put this twelve-hundred-pound bailer on it?

"A. Well, it lifted it up about fifty feet in the well up to the crown block.

"Q. Have you ever used that line since that first time?

"A. No, sir, we wrapped it up on the roll over there ready for delivery to the Williamsport Wire Rope Distributing Company or the Pelican or whoever wanted it.

"Q. Now, did you ever talk to any representative of the Williamsport Wire Rope Distributing Company about this line?

"A. Yes, sir, Mr. Geren; he came over to the lease to look at it. I don't know exactly what he did; it was shortly after that, I imagine about the second week in September, that he came there to the lease and looked at it and heard our story, and he reported to the company that he himself would report to the Pelican, at least he proposed that his company replace the line.

"Q. How long did you wait for the company to replace it?

"A. I think it was February, 1923—no, January, 1923.

"Q. Did the company ever replace it?

"A. No.

"Q. Did you have to buy another line?

"A. Yes, sir, I had to buy another line.

"Q. Have you any interest in this case whatever?

"A. No, sir. * * *

"Q. Did the Pelican people replace that line?

"A. Yes, sir, they replaced it.

"Q. They did not render you an additional bill for it?

"A. No, sir.

"Q. Just what did Mr. Geren say to you?

"A. He said that he was proposing to the company to replace the line. I don't think he said any more at the time. He said most likely that he would replace it all; that is all I remember of the conversation; but he left the impression that it would be replaced anyhow.

"Q. As a matter of fact, Mr. Geren said he would advise his company about it and ask for an adjustment and he thought they would do what was right?

"A. No, sir, I think he was a little more definite than that. He felt in his own mind that it should be replaced and he was more definite than that.

"Q. What is the present condition of that line?

"A. Well, it is in as good shape as it ever was.

"Q. Now, were you personally present there at the derrick at the time this line was tested?

"A. Yes, sir.

"Q. When it was first used?

"A. Yes, sir.

"Q. Did you see it when it kinked?

"A. Yes, sir.

"Q. Now you stated that you are a mining engineer and have been connected with oil production for a good many years?

"A. About fifteen years.

"Q. Now you know how to handle a rotary rig?

"A. Yes, sir.

"Q. And you were actually present at all times when this line was being used?

"A. Yes.

"Q. Well, I will ask you to state whether or not that line was properly handled on those occasions?

"A. Yes, sir, it was handled perfectly as far as I know.

"Q. Now could the snarling or twisting have taken place in it because of the manner it which it was being handled?

"A. No, it was impossible to keep it from snarling.

"Q. Mr. Ponton, where did that line kink?

"A. From one end to the other.

"Q. Well, what use could it be put to?

"A. Well, take it out and throw it away, it kinked so bad, it pulled the bailer out.

"Q. Now, is it not a fact that pulling it through the woods from one end to the other the full length of the line would injure it?

"A. No, sir, it is the best thing you can do.

"Q. The best thing that could possibly be done?

"A. Yes, sir.

"Q. That is the ideal treatment?

"A. Yes, sir, the only treatment we know of."

T. D. Sedberry testified, pages 18 and 19:

"Q. Did you get in touch with Mr. Geren?

"A. Yes, sir.

"Q. What did he do?

"A. Well, he went over, I don't know the exact date, but shortly afterwards he came back and called the office and told me in his opinion the line was defective and that he had written his home office at Tulsa, Oklahoma, recommending a new line.

"Q. Did you explain to Mr. Geren, who represented the Williamsport people, the position you were placed in in the matter?

"A. Yes, sir, I told him that Ponton said the line was defective, that it was worn out and that we were not going to charge him anything for that line and would replace it, if he requested, with a new line.

"Q. Did you subsequently replace it?

"A. Yes, sir, after waiting three or four months for the Williamsport people to make an adjustment on it.

"Q. Did you take the matter up in the meantime with the representative of the Williamsport people?

"A. Yes, sir, several times.

"Q. What did you tell him?

"A. Well, we told him that Mr. Ponton would naturally want a new line and we wanted them to replace it with one of their lines and if they did not we would have to replace it with another line of a different make, but we thought it was only fair to give them an opportunity to make their line good.

"Q. Did you tell him what disposition you had made of the other line?

"A. Well, after we saw that they were not going to make the line good we told them that the line was there subject to their orders and it was theirs not ours.

"Q. Now the line that was bought, was it a drilling line or a bailing line?

"A. A bailing line.

"Q. It was bought as a bailing line?

"A. Yes, sir."

A. B. Geren testified, pages 26, 27, 28, 29, 30, 31:

"Q. Mr. Geren, did you tell either Mr. Ponton or Mr. Sedberry that the line or drilling cable involved in this suit was defective?

"A. I don't believe that I made the direct statement that it was defective. I probably told Mr. Sedberry that it looked bad.

"Q. Whether or not it was defective, in such condition that it would kink or snarl, it would have had to be taken from the reel in order to tell that?

"A. No, sir, you could not state from the outside inspection of a line that it would not kink or give trouble.

"Q. Now, Mr. Geren, didn't you tell Mr. Sedberry after you had gone there and examined the line after Mr. Ponton had attempted to use it, didn't you tell Mr. Sedberry in your opinion the line should be replaced by your company?

"A. I told Mr. Sedberry that I had taken the matter up with the company and would ask for an adjustment.

"Q. Did you ask for an adjustment or replacement?

"A. I asked for an adjustment.

"Q. What kind of an adjustment?

"A. Well, to satisfy the customer.

"Q. Now did you see any of this line there that was kinked seriously?

"A. Yes, sir.

"Q. How much did you see?

"A. Well, I couldn't state the exact length, but it was coiled around the spool and stretched out over the ground and that part was kinked pretty bad.

"Q. That was the piece they cut off?

"A. Yes, sir.

"Q. You wouldn't call that a good line, would you?

"A. Of course if it was ruined it could not be called a good line.

"Q. Was that ruined?

"A. Yes, sir, that part was ruined.

"Q. You don't know how it was ruined?

"A. No, that was something I could not tell, not being on the ground at the time the line was taken out.

"Q. Now the balance of the line was wound around the spool there?

"A. Yes, sir.

"Q. Now, did Mr. Sedberry tell you that the line was there for you at any time that you wanted it?

"A. I don't remember whether he told me that or not. Of course, we didn't want the line after we sell it, because that is something the company does not do, take back a bailing line once they have sold it.

"Q. In other words, with the company the question of giving the purchaser another line is not the custom and you were not interested in this line?

"A. No, sir, I was not interested in that line.

"Q. Would not move it?

"A. No, sir."

We are convinced by the testimony that the bailing line was entirely worthless for the purpose for which it was manufactured and sold and we are also convinced that the defendant never intended to purchase nor the Williamsport Wire Rope Distributing Company to sell a bailing line that was worthless for use as such, and that, therefore, there was never a completed contract between the Williamsport Wire Rope Distributing Company and the defendant; the line remained the property of the Williamsport Wire Rope Distributing Company and defendant does not owe the price thereof; that the defendant is under no other obligation to Williamsport Wire Rope Distributing Company than to hold the line subject to its orders, especially since the evidence shows it is not worth

what the transportation charges on its return would be and the Williamsport Wire Rope Distributing Company or its liquidators, the plaintiffs, would not receive it if sent back.

It is therefore ordered, adjudged and decreed that the judgment appealed from be avoided and reversed and that plaintiffs' demands be rejected at their cost.