STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 CA 0140

THE SUCCESSION OF ANTHONY CIERVO, JR.

VERSUS

KIMBERLY L. ROBINSON, SECRETARY, DEPARTMENT OF
REVENUE, STATE OF LOUISIANA

*Judgment Rendered:*    DEC 1 2 2019

* * * * * * * *

Appealed from the
Louisiana Board of Tax Appeals
State of Louisiana
Case No. 10832D

The Honorable Judge Tony Graphia (Ret.) Chairman Presiding
Cade R. Cole, Board Member
Frances "Jay" Lobrano, Board Member

* * * * * * * *

| | |
|---|---|
| William A. Neilson, Sr.<br>Kyle A. Spaulding<br>New Orleans, Louisiana<br>and<br>Kevin M. Wheeler<br>Donald J. Miester, Jr.<br>New Orleans, Louisiana | Counsel for Plaintiff/Appellant<br>The Succession of Anthony Ciervo, Jr. |
| Miranda Y. Scroggins<br>Antonio Ferachi<br>Debra Morris<br>Brian DeJean'<br>Baton Rouge, Louisiana | Counsel for Defendant/Appellee<br>Kimberly Robinson, Secretary of the<br>Louisiana Department of Revenue |

* * * * * * * *

BEFORE: McDONALD, THERIOT, AND CHUTZ, JJ.

**THERIOT, J.**

In this income tax prescription case, a taxpayer's succession seeks review of a decision of the Board of Tax Appeals ("BTA"), which dismissed its Petition for Redetermination of Assessment filed against the Louisiana Department of Revenue ("LDR"). For the reasons set forth herein, we reverse and remand to the BTA.

## FACTS AND PROCEDURAL HISTORY

Anthony Ciervo, Jr. filed timely Louisiana state income tax returns for the tax years 2006-2011, all of which were accepted by the LDR. His original reported federal tax liability for the tax years 2006-2011 was $7,963.00, $10,184.00, $4,155.00, $2,747.00, $2,698.00, and $3,464.00, respectively.

On August 1, 2014, Mr. Ciervo made a preliminary request to participate in the federal Offshore Voluntary Disclosure Program ("OVDP") administered by the Internal Revenue Service ("IRS"). The OVDP's objective is to give taxpayers, who are out of compliance with United States tax and related laws due to undisclosed foreign accounts and assets, an opportunity to avoid the risk of substantial civil penalties and generally eliminate the risk of criminal prosecution for tax noncompliance and failure to file by voluntarily disclosing the foreign accounts and assets and submitting full payment of any tax liabilities for the years included, plus certain penalties and interest. In accordance with the requirements for participation in the OVDP, on April 24, 2015, Mr. Ciervo filed amended federal income tax returns for tax years 2006-2011, reporting his previously-undisclosed foreign accounts or assets, and made estimated advance payments of federal taxes, including penalties and interest, in the amounts of $1,731,329.00 for 2006, $1,879,993.00 for 2007, $1,567,482.00 for 2008, $576,755.00 for 2009, $320,786.00 for 2010, and $23,299.00 for 2011.

Mr. Ciervo died in March 2016, and "The Succession of Anthony Ciervo, Jr.," represented by its independent executor, Anthony V. Ciervo, proceeded with

2

the OVDP process. Following Mr. Ciervo's death, the IRS examined his amended returns, made adjustments, and refunded a portion of the estimated advance payments to reflect the adjustments. Once the OVDP process was concluded, the IRS reported the adjustments to Mr. Ciervo's 2006-2011 federal income tax liability to the LDR. The Succession did not report the adjustments to Mr. Ciervo's 2006-2011 federal tax liability to the LDR, nor did it file amended state returns for 2006-2011 to reflect the adjustments.

On June 26, 2017, based on the IRS report revealing a substantial discrepancy in federal tax liability between what was reported originally by Mr. Ciervo and what was reported on the amended returns, the LDR assessed additional state income tax owed by Mr. Ciervo for the tax years 2006-2011. These LDR assessments, which included tax, interest, and penalties calculated through July 11, 2017, totaled: $242,523.90 for 2006; $262,439.92 for 2007; $220,296.68 for 2008; $82,566.10 for 2009; $47,551.74 for 2010; and $2,612.18 for 2011.

The Succession protested the LDR assessments and filed a Petition for Redetermination of Assessment, asserting that the taxes were prescribed under the three-year prescriptive period provided by the Louisiana Constitution and that none of the provisions of La. R.S. 47:1580, which provide for interruption or suspension of prescription, were applicable. The LDR's answer denied the allegation that none of the provisions of La. R.S. 47:1580 were applicable and raised as an affirmative defense that the assessments were properly assessed and timely.

Although the LDR's assertion that its facially-prescribed assessment notices were timely implies an allegation that prescription was interrupted or suspended under La. R.S. 47:1580, the LDR did not specify the particular grounds for interruption or suspension on which it relied, either in its answer or in response to discovery requests. As a result, the Succession filed a motion to compel complete

3

discovery responses, as well as a motion to strike the LDR's affirmative defense of timeliness on the ground that it was not set forth with particularity as required by La. C.C.P. art. 1005. A hearing was held on the motions on April 11, 2018, at which time the LDR argued that its failure to provide more detailed discovery responses was at least partially the result of its inability to obtain information about Mr. Ciervo's federal taxes from the IRS. One example given by the LDR was its attempt to ascertain whether Mr. Ciervo had been audited by the IRS. The commencement of a federal audit would suspend prescription under La. R.S. 47:1580(B)(3), but without access to Mr. Ciervo's federal tax file to determine whether and when such an audit commenced, the LDR could not allege facts supporting suspension of prescription under La. R.S. 47:1580(B)(3) with particularity. According to the LDR, it had requested that the Succession obtain the federal transcripts and other necessary information from the IRS, since this information can be released to the taxpayer but not to the LDR, but the Succession had refused to do so. The LDR noted that its witness, LDR Management Analyst Ursula Domingue, has authority to access certain federal tax information regarding Mr. Ciervo and can testify as to those matters at the hearing on the merits; however, Ms. Domingue was not allowed to provide a printed copy or even show the federal tax information to LDR's counsel, thus preventing LDR from providing the detailed discovery responses requested by the Succession. At the conclusion of the April 11 hearing, the BTA indicated that it would take the matter under advisement, but cautioned the parties that granting of the motion to compel so close to the scheduled hearing date of May 8, 2018 would necessitate the rescheduling of the hearing on the merits. The BTA also recommended that the Succession obtain the tax transcripts requested by the LDR to eliminate the need for expert witness testimony as to matters that could be easily resolved by the documents, such as whether or not an audit took place. Faced with the prospect of

4

rescheduling the hearing on the merits, counsel for the Succession announced that he would "withdraw all of [the Succession's] discovery" in order to preserve the May 8, 2018 hearing date, and the BTA noted that the Succession's motion to strike and motion to compel were withdrawn.

The scheduling order issued by the BTA for the May 8, 2018 hearing on the merits required prehearing memoranda to be submitted and all witnesses disclosed at least fifteen days prior to the hearing. The Succession filed its prehearing memorandum and witness list on the April 23, 2018 deadline, revealing for the first time that: (1) Mr. Ciervo's amended federal returns were filed in accordance with the IRS's OVDP, which does not include an audit as part of the process, and (2) the closing agreement entered into by the Succession and the IRS as part of the OVDP explicitly states that no audit had taken place.

On April 24, 2018, the Succession filed a motion in limine, seeking to exclude the LDR's witnesses in order to prevent a "trial by ambush," since they had not been disclosed timely, and an advance objection to any request the LDR might make for a continuance of the hearing on the merits in order to cure the failure to file the witness list at least fifteen days before the hearing. The motion was set for hearing on May 8, 2018, immediately prior to the hearing on the merits.

On May 7, 2018, the LDR filed its prehearing memorandum and witness list. The only witness listed by the LDR was Ursula Domingue, who had been identified by the LDR as a potential witness at the April 11 hearing. The LDR's prehearing memorandum set forth several bases for its argument against prescription, including: (1) prescription on the 2011 tax year was suspended under La. R.S. 47:1580(B)(2) by Ciervo's OVDP agreement with the IRS; (2) prescription was interrupted under La. R.S. 47:1580(C)(1) by the Succession's failure to file an amended state return as required by La. R.S. 47:103(C) following the federal adjustments; (3) the adjustments reported to LDR by the IRS in October

5

2016 created an obligation for the Succession to file amended state returns, resulting in a duty for LDR to assess new taxes due; and (4) prescription was suspended under La. R.S. 47:1580(A)(4) by the filing of each of Mr. Ciervo's original returns because they were demonstratively false and "[t]he totality of the breadth of omissions, the major discrepancies in amounts reported to the IRS and [LDR], and the failure to file the amended [state] returns show a willful intent . . . to evade paying taxes to [LDR]." The LDR noted that although its prehearing memorandum was untimely, the facts supporting several of its listed arguments against prescription were not known to the LDR until it received the Succession's April 23, 2018 prehearing memorandum.

At the beginning of the hearing on the merits, the BTA granted the Succession's motion in limine, excluding the LDR's witness, except for rebuttal purposes, due to the LDR's failure to comply with the scheduling order regarding disclosure of witnesses. The Succession then asked the BTA to rule on its motion to strike the LDR's affirmative defense, which it asserted had been taken under advisement at the April 11 hearing. The Succession maintained that any assertion of fraud in connection with an affirmative defense had been waived by the LDR's failure to plead fraud with particularity in its answer. The LDR argued that it was not aware of certain facts supporting its affirmative defense until it received the Succession's April 23, 2018 prehearing memorandum, which disclosed Mr. Ciervo's participation in the OVDP for the first time. Although the BTA correctly noted that the Succession had voluntarily withdrawn its motion to strike the affirmative defense in order to preserve the hearing date, it nevertheless prohibited the LDR from claiming fraud or introducing evidence on the issue of fraud at the hearing on the merits. In so ruling, the BTA distinguished a fraudulent return from a false return, noting that the LDR was not prohibited from alleging that a false return was filed. However, the BTA noted that regardless of whether a return was

alleged to be fraudulent or false, evidence of intent to evade taxes would be required in order to suspend prescription under La. R.S. 47:1580(A)(4).

At the hearing on the merits, the following exhibits were filed by the Succession: Mr. Ciervo's original timely-filed 2006-2011 Louisiana income tax returns; the LDR's March 3, 2017 notices of proposed tax due for tax years 2006-2011; the Succession's March 30, 2017 protest letter, asserting that the proposed tax assessments were barred by prescription; the LDR's June 26, 2017 notices of assessment and appeal rights for tax years 2006-2011; the updated IRS account transcripts for tax years 2006-2011; and the IRS's published Frequently Asked Questions and Answers regarding the OVDP. Following the introduction of its exhibits, the Succession moved for a directed verdict, arguing that its documentary evidence proved that the assessments were facially-prescribed, and since the LDR had been prohibited from alleging fraud, they would be unable to prove suspension or interruption of prescription. The BTA denied the motion, noting that there are other bases besides fraud on which the LDR could possibly prove interruption or suspension of prescription under the law.

Jerald L. Curtner, a semi-retired former IRS revenue officer, testified as an expert on behalf of the Succession. Mr. Curtner's work for the IRS included analyzing IRS account transcripts and determining tax liability. Since his retirement from the IRS, he has assisted taxpayers in submitting offers and compromises to the IRS or the LDR in conjunction with audits and collection matters. Mr. Curtner reviewed Mr. Ciervo's 2006-2011 IRS account transcripts and testified regarding his conclusion that an IRS audit did not occur. According to Mr. Curtner, the transcripts contain a Code 420, which means that the return was flagged for a possible examination or audit, but did not contain Code 424, which would indicate an audit took place. Mr. Curtner explained that the IRS examination of the amended returns under the ODVP process was not an audit; it

was a less formal review simply to determine accuracy and completeness of the amended returns, without any of the rights afforded a taxpayer in the case of an audit.

Mr. Curtner was asked to explain why a taxpayer, such as Mr. Ciervo, would elect to participate in the OVDP and pay millions of dollars in tax, interest, and penalties, when the statute of limitations on those tax liabilities had already expired. Although he was unable to give an opinion as to why Mr. Ciervo in particular may have agreed to waive the statute of limitations and elect to participate in the OVDP, having never spoken to Mr. Ciervo or seen his OVDP application, Mr. Curtner acknowledged that the OVDP could be an aid for taxpayers who are ripe for being audited and incurring criminal penalties. Further, he noted that the statute of limitations for the IRS to assess taxes can be extended or eliminated altogether under certain circumstances, such as where the IRS can prove fraud.

Michael A. Mayhall, a board certified tax specialist who represents taxpayers before the IRS and LDR in connection with the OVDP,[1] also gave expert testimony on behalf of the Succession. Mr. Mayhall testified that Mr. Ciervo made a preliminary application to participate in the IRS's OVDP on August 1, 2014. In order to participate in the OVDP, Mr. Ciervo was required to submit all items listed in the voluntary disclosure submission within ninety days after approval of his preliminary request to participate. Although not a complete listing, Mr. Ciervo's voluntary disclosure submission was required to include the following for the 2006-2011 tax years: payment for the total amount of tax, interest, offshore penalty, accuracy-related penalty, and (if applicable) failure-to-file and failure-to-pay penalties; copies of previously-filed original and (if applicable) amended federal income tax returns; complete and accurate amended federal income tax

---

[1] Mr. Mayhall testified that he did not represent Mr. Ciervo in his application to participate in the OVDP.

returns, with applicable schedules detailing the amount and type of previously-unreported income from foreign financial accounts or domestic sources; copy of the completed and signed Offshore Voluntary Disclosure Letter submitted to the IRS Criminal Investigation Division; completed Foreign Account or Asset Statement for each previously-undisclosed OVDP asset during the voluntary disclosure period; completed and signed Taxpayer Account Summary with Penalty Calculation; properly completed and signed agreements to extend the period of time to assess tax (including tax penalties) and FBAR[2] penalties; copies of filed FBARs for foreign financial accounts maintained during the voluntary disclosure period; copies of statements for all financial accounts reflecting all account activity and all relevant documents pertaining to OVDP assets other than foreign financial accounts; a statement identifying all foreign entities, held directly or indirectly, as well as a statement concerning the entities' ownership or control; complete and accurate information returns (or amended returns, if applicable) required if foreign entities held ODVP assets; and any specific additional information requested by the examiner to process the voluntary disclosure. Mr. Mayhall testified that Mr. Ciervo submitted all items required for participation in the OVDP on April 23, 2015, and the OVDP process concluded on October 24, 2016, after Mr. Ciervo's death.

Like Mr. Curtner, Mr. Mayhall concluded, based on his review of the federal tax transcripts and his knowledge of the OVDP, that no IRS audit had taken place. Mr. Mayhall explained that Mr. Ciervo would not have even been eligible to participate in the OVDP if he was already under criminal investigation by the IRS Criminal Investigation Division or under IRS civil examination for any year, regardless of whether it related to undisclosed OVDP assets. Further, the OVDP process does not include the procedural formalities required of an audit, the 2006-

---

[2] FBAR is the common term referring to Reports of Foreign Bank and Financial Accounts.

2011 account transcripts did not include an audit code, and the closing agreement executed as part of the OVDP process contains an acknowledgment by the IRS that it did not conduct an audit.

Although the stated objective of the OVDP is "to bring taxpayers that have used undisclosed foreign accounts and assets . . . **to avoid or evade tax** into compliance with United States tax and related laws," (emphasis added), Mr. Mayhall explained that the 2014 OVDP was available to taxpayers who wished to voluntarily disclose their previously-undisclosed foreign accounts and assets to avoid prosecution and limit their exposure to civil penalties, without any requirement that the taxpayer admit that he had been intentionally avoiding or evading taxes. Mr. Mayhall testified that in his experience, there are a variety of reasons why a taxpayer would enter the OVDP, and not all of those reasons necessarily involve an intent to avoid or evade taxes:

> I represented people that didn't know they had offshore accounts.
> ****
> They did not know. It was set up by their parents and their parents had passed away and all of [a] sudden they find out years later that they had an offshore account and we would have to go back and adjust that.
> ****
> I've represented people who have come to the United States and who had accounts, say, in England or Italy, and didn't realize that they were supposed to . . . report those accounts and had income that they should have reported. That doesn't mean that they were evading the payment of the income tax.

Mr. Mayhall testified that in his review of Mr. Ciervo's OVDP submissions, he saw nothing at all that would indicate that Mr. Ciervo was subject to any criminal investigation by the IRS, and that it was possible that Mr. Ciervo had not been aware that he was required to disclose his offshore accounts.

The LDR called its witness, Ms. Domingue, on rebuttal. She testified that based on the submissions she reviewed, Mr. Ciervo had failed to report more than just offshore accounts and assets on his original tax returns. The Succession

objected to Ms. Domingue's testimony, and the BTA ruled that the LDR was attempting to prove fraud with Ms. Domingue's testimony and refused to allow further testimony on the issue.

After the conclusion of the hearing on the merits and submission of post-hearing memoranda, the BTA concluded, based on the Succession's own evidence showing the large discrepancy between Mr. Ciervo's reported and actual income in the 2006-2011 tax years, which was apparently due to undisclosed offshore assets, that Mr. Ciervo had filed false returns with the intent to evade taxes, which had the effect of suspending prescription until such time as LDR had notice of the false return or until a return which was not false was filed.[3]  Thus, the BTA concluded the LDR assessments were not prescribed and dismissed the Succession's petition. This appeal followed.

## DISCUSSION

The Succession appeals the judgment of the BTA pursuant to La. R.S. 47:1434(A), which provides that within thirty days of the signing of a decision or judgment of the BTA, any party may file a motion with the BTA for review of the decision or judgment by the appropriate appellate court.  Judicial review of a decision of the BTA is rendered upon the record as made before the BTA and is limited to facts on the record and questions of law.  The BTA's findings of fact should be accepted where there is substantial evidence in the record to support them and should not be set aside unless they are manifestly erroneous in view of the evidence on the entire record.  With regard to questions of law, the judgment of the BTA should be affirmed if the BTA has correctly applied the law and has adhered to the correct procedural standards.  *Secretary, Department of Revenue v.*

---

[3] The BTA did not make a finding as to whether the LDR carried its burden of proving the existence of a written agreement between Mr. Ciervo (or the Succession) and the IRS to suspend prescription of federal income tax or the commencement of an IRS audit of Mr. Ciervo.  The BTA noted that, while such a written agreement or commencement of an audit would serve to suspend prescription that had not already run, the earliest date on which such an agreement would have been executed or an audit commenced would have been July 8, 2016, the date on which the amended returns were assigned to an examiner for review.  By that time, the three-year prescriptive period had expired for all tax years at issue.

11

*Calcasieu Refining Co.*, 00-1735, p. 6 (La.App. 1 Cir. 9/28/01), 809 So.2d 1023, 1028. In this appeal, the Succession argues that the BTA's ruling was procedurally barred, legally incorrect due to statutory misinterpretation, and not supported by the facts.

Under the Louisiana Constitution, taxes prescribe in three years after the last day of the year in which they are due, unless prescription is interrupted or suspended as provided by law. La. Const. Art. VII, § 16. Under this provision, all taxes at issue in this case would prescribe on or before December 31, 2015; therefore, the tax notices issued by the LDR on March 3, 2017 are time-barred unless prescription was interrupted or suspended.

Interruption and suspension of prescription of tax assessments is governed by La. R.S. 47:1580[4]:

> A. The prescription running against any state tax, license, excise, interest, penalty, or other charge shall be suspended by any of the following:
>
> (1) The secretary's action in assessing any such amounts in the manner provided by law.
>
> (2) The filing of a summary proceeding in court.
>
> (3) The filing of any pleading, either by the secretary or by a taxpayer, with the Board of Tax Appeals or any state or federal court.
>
> (4) The filing of a false or fraudulent return, as defined in R.S. 47:1605(B)(2), provided that suspended prescription shall begin to run again upon notice to the secretary of the filing of the false or fraudulent return or upon the subsequent filing of a return which is not false or fraudulent.
>
> (5) Repealed by Acts 1997, No. 1348, § 2, eff. July 15, 1997.
>
> B. The running of such prescription shall also be suspended prior to the lapse of the prescriptive period set out in the Constitution of Louisiana as hereinafter provided:

---

[4] Louisiana Revised Statutes 47:1580 was subsequently amended by 2019 La. Acts, No. 367, § 1, effective June 18, 2019.

12

(1) For any period by means of a written agreement between the taxpayer and the secretary of the Department of Revenue; or

(2) With respect to income tax, for any period by means of a written agreement entered into between a taxpayer and the United States Internal Revenue Service suspending the prescription of federal income tax; or

(3) With respect to income tax, for any period from the time of the commencement of an audit of a taxpayer by the United States Internal Revenue Service until one year from the time the secretary of the Department of Revenue is notified by said taxpayer or the federal government of an agreed change to the taxpayer's United States income tax return.

(4) With respect to bankruptcy, for any period from the time the taxpayer files for bankruptcy until six months after the bankruptcy case is closed.

(5)(a) By the filing of a claim for refund for the period for which a refund is requested, which shall suspend prescription for the same period in order for the secretary to determine whether the taxpayer owes any other liability under the provisions of R.S. 47:1622.

(b) The collector may not assert a collection remedy against a taxpayer for a tax that would have been prescribed but for this Paragraph except through a defense, answer, or reconventional demand in offset of an action concerning the claim for refund.

(c) The provisions of Subparagraph (a) of this Paragraph governing the suspension of prescription shall not apply in the following circumstances:

(i) The claim for refund referenced in this Paragraph has been granted.

(ii) The claim for refund referenced in this Paragraph is denied and the refund denial is final and nonappealable.

(iii) A judgment of the Board of Tax Appeals concerning the refund referenced in this Paragraph has become final.

C. (1) The failure to file any return required to be filed by this Subtitle shall interrupt the running of prescription, and prescription shall not commence to run again until the subsequent filing of such return. Once prescription commences to run, the tax, license, excise, interest, penalty, or other charge which is reported on such return shall

13

prescribe in three years after the thirty-first day of December of the year of the filing of the return. However, if a taxpayer who does not file a tax return required to be filed by this Subtitle later becomes responsible for the filing of such a return due to a final court decision rendering a transaction or other activity as taxable, and the laws, regulation, or jurisprudence of this state previously classified that transaction, or other activity as nontaxable, this provision shall not apply and prescription shall run as if the taxpayer had timely filed the return.

(2) The interruption of the running of prescription due to the failure to file a return reporting a state tax shall not apply to any state tax periods for which the secretary and the taxpayer have entered into a valid and enforceable voluntary disclosure agreement.

(3) The provisions of this Subsection shall apply to use tax returns only when the amount due exceeds five hundred dollars for the tax levied.

The Succession first argues that the BTA was procedurally barred from concluding that Mr. Ciervo had filed false returns with the intent to evade taxes because this affirmative defense was not properly pled by the LDR under BTA Rule 5[5] and La. C.C.P. arts. 1003,[6] 1005,[7] and 1154.[8]

A defendant is required to affirmatively set forth in his answer any matter constituting an affirmative defense on which he will rely. La. C.C.P. art. 1005.

---

[5] Louisiana Board of Tax Appeals Rule 5 provides:

> The allegations of the petition must be categorically answered in numbered paragraphs corresponding to those of the petition. The answer shall admit or deny the allegations of the petition and state in short concise terms the material facts upon which the defenses to the action asserted are based, and shall set forth any affirmative defenses. An answer containing a general denial will not be considered sufficient unless the Collector, in good faith, has no information available to the secretary to otherwise respond to the petition.
>
> The answer shall contain a signed certificate stating that a copy of the answer has been mailed to the party filing the petition. Answers shall be filed within a period of thirty (30) days from the date of service of the petition.

[6] Article 1003 provides that an answer shall admit or deny the allegations of the petition, state in short and concise terms the material facts upon which the defenses to the action asserted are based, and shall set forth all affirmative defenses as required by Article 1005.

[7] Article 1005 provides that the answer shall set forth affirmatively negligence, or fault of the plaintiff and others, duress, error or mistake, estoppel, extinguishment of the obligation in any manner, failure of consideration, fraud, illegality, injury by fellow servant, and any other matter constituting an affirmative defense.

[8] Article 1154 provides that when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby, and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense on the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

14

Where fraud is alleged, the circumstances constituting fraud must be alleged with particularity; however, conditions of the mind of a person, such as intent, may be alleged generally. La. C.C.P. art. 856.

An affirmative defense raises a new matter which, assuming the allegations in the petition to be true, constitutes a defense to the action and will have the effect of defeating the plaintiff's demand on its merits. *Johnson v. Steele*, 98-1726, p. 5 (La.App. 1 Cir. 9/24/99), 754 So.2d 1006, 1009. Implicit in that definition is the conclusion that a defendant is not required to raise an issue as an affirmative defense if it does not raise a "new matter." *Fishbein v. State ex rel. LSU Health Sciences Center*, 06-0549, p. 6 (La.App. 1 Cir. 3/9/07), 960 So.2d 67, 72, *writ denied*, 07-0730 (La. 6/22/07), 959 So.2d 495, and *writ denied*, 07-0708 (La. 6/22/07), 959 So.2d 505. The purpose of the requirement that certain defenses be affirmatively pled is to give the plaintiff fair and adequate notice of the nature of the defense, preventing last minute surprise. *Dupont v. Hebert*, 06-2334, p. 8 n. 5 (La.App. 1 Cir. 2/20/08), 984 So.2d 800, 807, *writ denied*, 08-0640 (La. 5/9/08), 980 So.2d 695.

The Succession's petition alleges that "none of the provisions of La. R.S. § 47:1580 apply to this case to extend the three year statute of limitations." The LDR denied this allegation in its answer. Thus, since the issue of whether or not prescription had been interrupted or suspended by any provisions of La. R.S. 47:1580 was not a new matter, it did not have to be raised in an affirmative defense. See *Fishbein*, 06-0549 at p. 6, 960 So.2d at 71-72.

The LDR nevertheless included an affirmative defense that the assessments were timely in its answer, but did not set forth the material facts supporting its allegation. At the April 11, 2018 hearing on the Succession's motion to compel and motion to strike, counsel for the LDR explained that discovery was still

15

ongoing and that it could not set forth the material facts on which its defense was based until it had access to Mr. Ciervo's IRS tax file, which had been denied up to that point. Counsel for the LDR stated that it believed that Mr. Ciervo had been audited by the IRS, which would have suspended prescription under La. R.S. 47:1580(B)(3), but that it could not allege specific facts to support that defense until additional discovery was completed. In response to the LDR's discovery requests, the Succession had repeatedly denied that an audit had taken place, but did not give any additional information or provide documentary support for its denial. Once the Succession revealed in its prehearing memorandum that Mr. Ciervo had filed amended returns in conjunction with his participation in the OVDP, the LDR included an argument in its own prehearing memorandum that prescription had been suspended under La. R.S. 47:1580(A)(4) by Mr. Ciervo's filing of a false or fraudulent return with the intent to evade taxes.

Considering that the Succession was aware of Mr. Ciervo's participation in the OVDP prior to the time this suit was filed, since the Succession concluded the OVDP process following Mr. Ciervo's death, and further considering that the OVDP is intended to aid taxpayers who have used undisclosed foreign accounts and assets to avoid or evade taxes, the Succession cannot reasonably argue that it was surprised at the hearing on the merits by the LDR's contention that prescription was suspended by the filing of a false or fraudulent return with the intent to evade taxes. See Johnson, 98-1726, pp. 6-7, 754 So.2d at 1010. The purpose behind the affirmative defense requirement is not thwarted by the BTA's consideration of the "false or fraudulent return" basis for suspending prescription, especially considering that all evidence supporting this defense was introduced by the Succession. Because the Succession already had knowledge of Mr. Ciervo's participation in the OVDP and substantial underreporting of income, as proven by its own exhibits, any error by the BTA in considering an affirmative defense which

16

was not set forth with particularity in the answer was harmless error. See *Ochsner Clinic Foundation v. Arguello*, 11-326, p. 8 (La.App. 5 Cir. 11/29/11), 80 So.3d 622, 626.

The Succession next argues that since the BTA ruled prior to the start of the hearing that the LDR could not claim fraud or introduce evidence on the issue of fraud, the BTA could not conclude that prescription was suspended based on La. R.S. 47:1580(A)(4), since this would require proof of fraud.

Prescription is suspended under La. R.S. 47:1580(A)(4) where a taxpayer files "a false or fraudulent return, as defined in [La.] R.S. 47:1605(B)(2)." The phrase "false or fraudulent report"[9] is defined in Section 1605(B)(2) as "any report filed with the intent to evade taxes, or a willful attempt to defraud or evade taxes that are due." Although Section 1605(B)(2) defines "false or fraudulent report" as a phrase, without distinguishing between a return which is merely false, as opposed to fraudulent, the Louisiana Supreme Court in *Elevating Boats, Inc. v. St. Bernard Parish*, 00-3518, p. 17 n. 15 (La. 9/5/01), 795 So.2d 1153, 1165 (overruled on other grounds) acknowledged such a distinction. In any event, the language of Section 1605(B)(2) is clear that "any report" filed with intent to evade taxes will suspend prescription under Section 1580(A)(4).

When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La. C.C. art. 9; La. R.S. 1:4. This principle applies to tax statutes. *Tarver v. E.I. Du Pont De Nemours and Co.*, 93-1005 (La. 3/24/94), 634 So.2d 356, 358. Thus, we disagree with the Succession's argument that suspension of prescription under La. R.S. 47:1580(A)(4) requires a finding of fraud.

---

[9] No explanation is given for the discrepancy between the terms "false or fraudulent *return*" in La. R.S. 47:1580 (A)(4) and "false or fraudulent *report*" in La. R.S. 47:1605(B)(2).

Lastly, the Succession argues that the BTA erred in concluding that Mr. Ciervo filed his 2006-2011 returns with the intent to evade taxes. The Succession argues that the BTA improperly shifted the burden of proof on the LDR's affirmative defense to the Succession, requiring the Succession to disprove fraudulent intent.

The LDR had the burden on its affirmative defense to prove that Mr. Ciervo filed his 2006-2011 returns with the intent to evade taxes. Although there is a lack of Louisiana state court decisions that provide guidance regarding the proof required, it is well settled that where Louisiana patterns its tax code after the federal tax code, it is proper to follow federal jurisprudence interpreting the corresponding federal statutes. *Orillion v. Crawford*, 05-0559, pp. 8-9 (La.App. 1 Cir. 9/1/06), 964 So.2d 950, 956, citing *W. Horace Williams Co. v. Cocreham*, 38 So.2d 157, 159 (La. 1948). Louisiana's individual income tax law is intended to conform to the United States Internal Revenue Code. La. R.S. 47:290. Section 1580(A)(4) is patterned after IRC § 6501(c)(1), which provides for an exemption from the applicable statute of limitations period where the taxpayer files a "false or fraudulent return with the intent to evade tax."

Under the federal jurisprudence, the burden of proving an exception to the general limitation period based on the filing of a false or fraudulent return with intent to evade taxes requires proof, by clear and convincing evidence, that: (1) an underpayment exists for each year and (2) the taxpayer intended to evade taxes that he knew or believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. *Mathews v. Commissioner*, 116 T.C.M. (CCH) 580 (2018), 2018WL6813959, *8. The specific intent to evade taxes known or believed to be owing is frequently equated to fraudulent intent. See *BASR Partnership v. United States*, 795 F.3d 1338, 1343-44 (Fed. Cir. 2015).

18

The existence of fraudulent intent is a question of fact. Fraudulent intent is never presumed; rather it must be proved by clear and convincing evidence. The "clear and convincing evidence" standard is somewhere between proof beyond a reasonable doubt and proof by a preponderance of the evidence. *Poirier v. Collector of Revenue*, 417 So.2d 410, 412 (La.App. 1 Cir. 1982). Since direct proof of a taxpayer's intent is rarely available, fraudulent intent may be proven by circumstantial evidence and reasonable inferences drawn from the relevant facts, such as the taxpayer's conduct and the surrounding circumstances. *Mathews*, 2018WL6813959 at *8; *Seiffert v. Commissioner*, 107 T.C.M. (CCH) 1017 (2014), 2014WL92058, *6. The sophistication, education, and intelligence of a taxpayer are relevant considerations in determining whether a taxpayer has the requisite fraudulent intent. *Id.*

The inquiry into a taxpayer's intent is guided by indicia or "badges" of fraud, including the following nonexclusive factors: understatement of income; inadequate recordkeeping; failure to file tax returns; concealment of income or assets; failure to cooperate with tax authorities; filing false documents (including filing false tax returns); failure to make estimated tax payments; engaging in and attempting to conceal illegal activity; dealing in cash; implausible or inconsistent explanations of behavior; an intent to mislead that may be inferred from a pattern of conduct; and lack of credibility of the taxpayer's testimony. *Mathews*, 2018WL6813959 at *9; *Seiffert*, 2014WL92058 at *6. No single factor itself is sufficient to establish fraudulent intent, but the combination of a number of factors may be persuasive circumstantial evidence of fraudulent intent. *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992). Furthermore, even if badges of fraud are present, a taxpayer may have a good-faith misunderstanding of the law that weighs against fraudulent intent. *Porter v. Commissioner*, 110 T.C.M. (CCH) 1 (2015), 2015WL3988268, *23.

19

In this case, the BTA concluded that Mr. Ciervo filed false tax returns for the 2006-2011 tax years with the intent to evade taxes. Based on this finding, the BTA concluded that prescription was suspended under La. R.S. 47:1580(A)(4) as of the time of the original, timely filings. The BTA based its finding of intent to evade taxes on the following indicia of fraud: (1) Mr. Ciervo "unquestionably substantially understated his income by many millions of dollars on his original federal returns" for six consecutive years; (2) Mr. Ciervo maintained large sums of money in undisclosed offshore accounts, suggesting that he was a sophisticated taxpayer who knew how to conceal assets overseas from state and federal authorities; and (3) Mr. Ciervo filed false documents. The BTA noted that those three indicia of fraud, considered together, with no evidence offered to explain why Mr. Ciervo maintained large sums of money in offshore accounts or to suggest that the failure to disclose the offshore accounts and assets was due to an innocent mistake or the product of an innocent misunderstanding, all point towards an intent to evade taxes.

We do not disagree with the BTA that Mr. Ciervo's substantial understatement of his income for six consecutive years is a "badge of fraud." While mere understatement of income, standing alone, is not clear and convincing evidence of fraudulent intent to evade taxes, consistent and substantial understating of income has repeatedly been recognized as a strong indicator of fraudulent intent to evade taxes, especially if the reason for the understatements is not because of innocent mistake or is not otherwise satisfactorily explained. See _Porter_, 110 T.C.M. at *19; _Webb v. Commissioner_, 394 F.2d 366, 379 (5th Cir. 1968); _Merritt v. Commissioner_, 301 F.2d 484, 487 (5th Cir. 1962). The Succession's experts testified that there may be innocent reasons why a taxpayer may have undisclosed foreign accounts and assets; however, there was no evidence that Mr. Ciervo's consistent, substantial underreporting was the result of an innocent mistake or that

20

a satisfactory explanation existed for the underreporting. Thus, there was no evidence to weigh against the inference of fraudulent intent created by the understatement of income. It must be noted, however, that Mr. Ciervo's underreporting of income creates only an inference (rather than clear and convincing evidence) of fraudulent intent, and the record in this case is void of any evidence which could potentially shed light on his knowledge, level of culpability, or intent in underreporting his income, so as to amount to clear and convincing evidence of fraudulent intent. The record contains no evidence of Mr. Ciervo's educational level, occupation, or work history; the source of the funds in the foreign accounts (e.g., earned income, unearned income, or inherited funds); or the foreign account(s) themselves (e.g., number and type of accounts, name on the accounts, and by whom they were opened).

The BTA considered Mr. Ciervo's maintenance of large sums of money in undisclosed offshore accounts to be further evidence of his fraudulent intent. Although concealment of assets overseas in foreign financial institutions is indicative of intent to evade taxes, courts have held in some cases involving an unsophisticated taxpayer that the failure to disclose was the product of an innocent misunderstanding, which would mitigate against a finding of fraudulent intent. See *Alexander v. Commissioner*, 106 T.C.M. (CCH) 198 (2013), 2013WL4606105, *17. It is not clear on what evidence the BTA based its conclusion that the maintenance of large sums of money in undisclosed offshore accounts suggests that Mr. Ciervo was a "sophisticated taxpayer who knew how to hide his assets from state and federal authorities." As noted above, the record contained no evidence of Mr. Ciervo's education level, occupation, the source of the offshore funds or accounts, or whether Mr. Ciervo relied on the knowledge and expertise of a tax advisor in failing to disclose the offshore income or accounts. See *Mathews*, 116 T.C.M. (CCH) 580 at *9; *Alexander*, 106 T.C.M. (CCH) 198 at *15-16; *Rahall*

21

*v. Commissioner*, 101 T.C.M. (CCH) 1486 (2011), 2011WL1848540, \*11. Thus, while the record supports the BTA's finding that Mr. Ciervo had large sums of money overseas in foreign financial institutions, the evidence does not support the BTA's conclusion that Mr. Ciervo was a sophisticated taxpayer who knew how to hide assets from tax authorities. Neither, however, was there any evidence that Mr. Ciervo was an unsophisticated taxpayer or that his failure to disclose his offshore income and assets was the product of an innocent misunderstanding. Thus, there was no mitigating evidence to weigh against the inference of fraudulent intent created by the concealment of assets overseas.

The final badge of fraud relied on by the BTA was Mr. Ciervo's filing of false documents, including false income tax returns. *Green v. Commissioner*, 111 T.C.M. (CCH) 1299 (2016), 2016WL1559621, \*15. Although filing false documents is considered to be evidence of fraudulent intent, even a criminal conviction for filing false returns does not conclusively establish that a taxpayer intended to evade taxes. *Mathews*, 116 T.C.M. (CCH) 580 at \*11. Furthermore, since the falsity of Mr. Ciervo's returns was due to the underreporting of income on his income tax returns, this third badge of fraud does not add to the evidentiary support discussed above for a finding of fraudulent intent.

Based on the record as a whole, we cannot say that the LDR carried its burden of proof of fraudulent intent by clear and convincing evidence. Although the fact that Mr. Ciervo substantially underreported his income on six consecutive years of federal and state income tax returns by failing to disclose foreign assets or accounts certainly creates suspicion of fraudulent intent to evade taxes, mere suspicion does not equate to clear and convincing evidence of fraudulent intent. See *Thomas F. v. Commissioner*, 101 T.C.M. (CCH) 1550 (2011), 2011WL2135376, \*16; *Poirier*, 417 So.2d at 413. Accordingly, the BTA's conclusion that prescription was suspended by the filing of false returns with the

intent to evade taxes is manifestly erroneous, and the judgment dismissing the Succession's petition is reversed.

## CONCLUSION

For the reasons set forth herein, we reverse the September 11, 2018 judgment of the BTA dismissing the Succession's Petition for Redetermination of Assessment and remand this matter to the BTA for further proceedings in accordance with this opinion. All costs of this appeal, in the amount of $2,041.80 are assessed to the Louisiana Department of Revenue.

**REVERSED AND REMANDED.**